ARROW MASTER, INCORPORATED, a corporation existing under the laws of the State of Illinois, Plaintiff–Appellee,

v.

UNIQUE FORMING LIMITED, a corporation existing under the laws of Ontario, Canada, and Antonio Sabato, an individual, Defendants–Appellants.

No. 92–3578.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1993.

Decided Dec. 23, 1993.

---

Alan G. Blackwood (argued), Blackwood, Nowinski, Huntoon & Swanson, Moline, IL, for plaintiff-appellee.

Stephen T. Fieweger (argued), Peter C. Fieweger, Katz, McAndrews, Balch, Lefstein & Fieweger, Rock Island, IL, for defendants-appellants.

Before CUDAHY, RIPPLE, and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.

Arrow Master, Incorporated ("Arrow Master") and Unique Forming Limited ("Unique") entered into a contract for Unique's purchase of Arrow Master's business and assets. At the same time, Unique executed a promissory note for $100,000 of the $260,000 purchase price under the agreement. When Unique stopped payment on the note, Arrow Master sued for default under the terms of the note. Unique counterclaimed that Arrow Master had committed a material breach of the contract by failing to deliver all the assets.[1] The district court granted judgment in favor of Arrow Master. It held that Unique had defaulted on the note and that Arrow Master had complied fully with all provisions of the purchase agreement. Unique has appealed from that decision. For the reasons that follow, we affirm.

I

BACKGROUND

Unique is a Canadian company that makes and sells concrete products. Arrow Master is an Illinois corporation that makes and sells concrete vibrators. Antonio Sabato, President of Unique, and his business associate Joe Vecchio,[2] President of the Canadian com-

---

1. Jurisdiction is based on diversity of citizenship. *See* 28 U.S.C. § 1332 (1988). The parties agreed, under ¶ 9(j) of the contract, that Illinois law governs the resolution of disputes under the contract.

2. Joseph Vecchio is not a party to this action. For this reason, at the beginning of the trial Arrow Master's attorney moved for his exclusion from the courtroom. Tr. at 15. However, Unique's attorney stated that "Mr. Vecchio is every bit the principal in this case that Mr. Saba-

panies AJV Tools and J & F Floats & Trowels, Ltd., were impressed with Arrow Master's vibrators. In fact, Mr. Vecchio had purchased approximately 100 of the vibrators between 1986 and 1987. Tr. at 27–29. The two men formed a corporation named AJS Concrete Vibrators, Inc. for the purpose of purchasing Arrow Master's concrete vibrator lines and business in order to manufacture concrete vibrators in Toronto. Tr. at 46–50, 179.

Mr. Sabato drafted the initial contract of sale. After discussions with Arrow Master's

to is." Tr. at 17. He explained that the two men participated in the purchase of Arrow Master with a view toward operating a business called AJS Concrete Vibrators. They used Unique as the purchaser because Unique had a good business background and credit rating. According to counsel for Unique, they intended to transfer all the goods to the new company, for consideration, once Unique purchased Arrow Master's business. Following this explanation, the court denied the motion for exclusion of Mr. Vecchio. Tr. at 16–17. Later, during his testimony, Mr. Vecchio also stated that the two corporations he owned, AJV Tools Ltd. and J & F Floats & Trowels Ltd., gave the funds to Unique to purchase Arrow Master, and were to be reimbursed when Unique transferred the assets of the business to the new corporation AJS. Tr. at 78–79.

3. Because the issue in this appeal is the interpretation of the contract, we include the pertinent provisions:

Further to our discussions, the following sets out the terms and conditions upon which Unique Forming Ltd. (the "Purchaser") has agreed to purchase the business and assets of the concrete vibrator products of Arrow Master Inc. (the "Vendor") and the Vendor has agreed to sell such business and assets to grant to the Purchaser all such rights as are necessary to permit the Purchaser to manufacture, assemble, market, distribute and sell the products relating to such a business. Hereinafter such business is defined as consisting of the manufacturer, assembly, sale and distribution of concrete vibrators and all parts and supplies relating thereto (the "Business"), such as Remington, Dart, and Master.
1. **Purchase of Assets**
On the Closing Date, the Purchaser agrees to purchase from the Vendor and the Vendor agrees to sell, transfer and assign to the Purchaser the following (the "Purchased Assets"):
(a) all inventory of vibrators of the Business including without limitation all parts, containers and supplies relating thereto and all items referred to in exhibit A, A.1, B, C, D initialled for identification by the parties; and
(b) all tooling, dies, fixtures, testing equipment and special machinery, together with all parts,

president, E.L. Gustafson, vice-president, David Harris, and marketing manager, Jerry Kirkman, the contract was changed and finalized. On September 15, 1988, Arrow Master and Unique entered into a written agreement for the sale and purchase of Arrow Master's business and assets.[3] The purchase price for the business was $260,000: $160,000 at closing and $100,000 secured by a promissory note to be paid in 24 monthly installments.

Under the contract, Unique purchased three categories of assets. The first was

containers and supplies relating thereto and all the items referred to in exhibit A initialled for identification by the parties; and
(c) the goodwill of the Business and the goodwill associated with the names "Remington, Dart, Master" to the extent and only to the extent such name is used in connection with the Business (the "Goodwill") and all supplier and customer lists and documentation, brochures, advertising materials, design and production drawings, manufacturing handbooks, prints, manuals, assembly documents and other know how and technical information which is the property of the Vendor....
6. **Terms of Delivery and Closing**
The Vendor will transfer, assign and convey title to and possession of the Purchased Assets to the Purchaser on September 16, 1988 (the "Closing Date") upon compliance with the following terms and conditions:
(a) the Vendor shall have delivered to the Purchaser the documents;
(b) the Vendor shall have delivered to the Purchaser a bill of sale with respect to the Purchased Assets;
(c) the Vendor at its expense shall have packed and loaded all of the physical assets being purchased on trucks provided by the Purchaser at the Vendor's yard;

9. **General**
(a) Time shall be of the essence in this agreement;
(b) All amounts herein are in U.S. funds;
(c) The Vendor shall instruct and direct any foundry holding dies used in the business to release such dies to the Purchaser or otherwise deal with such dies as the Purchaser may direct;
(d) This agreement contains the entire agreement between the parties with respect to the subject matter hereof and shall only be modified in writing by the parties hereto;
(e) All inventory, equipment, parts and supplies shall be delivered to the Purchaser in the wire containers used by the Vendor to warehouse its inventory;

Arrow Master's inventory of concrete vibrators, including "all parts, containers and supplies relating thereto." ¶ 1(a). The second group of assets encompassed all manufacturing materials, which are listed as the "tooling, dies, fixtures, testing equipment and special machinery," and which also include molds, patterns and castings of parts made for the vibrator.[4] ¶ 1(b). The last type of asset Unique purchased was Arrow Master's good will, lists and documents. ¶ 1(c).

Unique made three payments on the note in 1989: on April 25, June 6, and November 17. Unique did not submit further payments, however, on the ground that Arrow Master did not deliver the manufacturing materials held by Arrow Master's suppliers, as Unique claimed the contract required. Arrow Master insisted that it had complied with the contract by furnishing Unique with lists of the component suppliers and by sending the suppliers a letter informing them that Unique had purchased its company. Arrow Master then brought suit against Unique for default on the promissory note.

A bench trial was conducted by a magistrate judge sitting as the district court. *See* 28 U.S.C. § 636(b)(1)(B). The district court held that Arrow Master had complied with the terms of the contract by notifying suppliers of the sale of its assets. It focused on paragraph 9(c), the pertinent provision concerning notice to vendors, which states:

> The vendor shall instruct and direct any foundry holding dies used in the business to release such dies to the purchaser or otherwise deal with such dies as the purchaser may direct.

The district court found that Arrow Master had notified not only all foundries but all vendors of the sale of the assets. Noting that the purchase contract must be construed against the writer, the district court held that this notification constituted full compliance with the contract. The district court concluded that Unique had defaulted on the note, and that Arrow Master, having complied fully with all provisions of the contract, had committed no material breach. Accordingly, it granted judgment for Arrow Master and against Unique in the amount of $93,210.20, plus interest.

## II

## ANALYSIS

Unique's appeal focuses on the manufacturing materials owned by Arrow Master but in the possession of suppliers. The major portion of its brief is dedicated to establishing that these dies, molds, and manufacturing parts, situated in the factories of third party vendors, are part of the assets sold. However, this issue is not challenged by Arrow Master. It agrees that the materials owned by Arrow Master but in the possession of other companies were indeed part of the assets purchased by Unique under the contract.[5]

Unique next contends that Arrow Master committed a material breach of the contract by (1) failing to deliver to Unique those manufacturing materials they owned, wherever located, and/or (2) failing to direct the delivery of those materials by the suppliers holding them. It urges us to reverse the district court's decision as contrary to the law and the evidence in this case. We shall examine each contention in turn.

## A.

Unique first asserts that the provisions of the contract, read as a whole, reflect

---

4. We note that the term "manufacturing materials" has been employed by the parties to encompass the dies, tooling, and other items owned by Arrow Master but in the possession of third parties. These pieces are used to make parts for the vibrators. At oral argument, Arrow Master clarified that, under the contract, these items were never considered or referred to as "equipment," "inventory," "parts," or "supplies." *See* Contract ¶ 9(e). Unique, which drafted the contract, has made no argument to the contrary.

5. E.L. Gustafson, Arrow Master's President, testified by deposition that Arrow Master was selling all its assets, including the manufacturing materials. To the extent the parts were existing and available, even if located at other suppliers, they had been sold to Unique under the contract. Tr. at 551–52. He stated that Joe Vecchio had made it known to Arrow Master that he wanted to go into the business of manufacturing and selling those concrete vibrators in Ontario. Tr. at 546, 555. He also testified that Unique could obtain whatever tooling Arrow Master owned to the extent that Unique wanted it. Tr. at 556–58.

the parties' intent that Arrow Master effectuate delivery of the manufacturing materials. Unique points specifically to paragraph 1(b), which identifies the dies, tooling, and other materials as part of the purchased assets. It also refers generally to paragraph 5, which discusses Arrow Master's good title to the purchased assets, and paragraph 6, which concerns the transfer and delivery of those assets to Unique.

■ Under Illinois law, "[t]he primary object in construing a contract is to give effect to the intention of the parties." *Airline Stewards & Stewardesses Ass'n, Local 550 v. American Airlines, Inc.,* 763 F.2d 875, 877 (7th Cir.1985), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986): "[I]f a contract is 'in writing, is unambiguous and contains no uncertain terms, interpretation of the contract is a question of law for the court,' and no evidence outside the four corners may be employed to construe its terms." *National Diamond Syndicate, Inc. v. United Parcel Serv., Inc.,* 897 F.2d 253, 256 (7th Cir.1990) (citations omitted); *accord LaSalle Nat'l Bank v. Service Merchandise Co.,* 827 F.2d 74, 78 (7th Cir.1987) (stating that declaration of the meaning of an unambiguous contract requires de novo review). "[C]ontracts are to be interpreted as a whole, giving meaning and effect to each provision of the contract." *Mayfair Constr. Co. v. Waveland Assoc. Phase I Ltd. Partnership,* 249 Ill.App.3d 188, 196, 619 N.E.2d 144, 152 (1993). "In construing a contract, it is presumed that all provisions were inserted for a purpose, and conflicting provisions will be reconciled if possible so as to give effect to all of the contract's provisions." *Id.* (citations omitted).

Our examination of the contract confirms that its provisions do not include a requirement that Arrow Master deliver to Unique the manufacturing materials held by outside suppliers. The only two sections that might apply to this issue are paragraphs 6 and 9. Paragraph 6, the only portion of the contract dealing specifically with "Terms of Delivery

and Closing," requires Arrow Master to bear the burden of the expense of packing the company's physical assets and loading them on trucks that Unique will provide "at the Vendor's yard." Paragraph 9(c) requires Arrow Master to inform "any foundry holding dies used in the business" either to turn them over to Unique or to deal with Unique as Unique directs.

Unique has not based its delivery claim on paragraph 6, but rather on the intent reflected in the entire contract, and specifically in paragraph 9(c). However, the language of the contract does not support such an interpretation. As can readily be seen, paragraph 6 presents a delivery requirement for the assets on Arrow Master's premises and in its possession,[6] and paragraph 9 contains a notice requirement for foundries holding assets of Arrow Master. Moreover, there is no other provision in the contract concerning delivery of assets in other locations.

### B.

■ Unique also claims that Arrow Master breached paragraph 9(c) of the contract by failing to provide sufficient notice and direction to suppliers holding the manufacturing materials. As discussed above, paragraph 9(c) requires Arrow Master to "instruct and direct any foundry holding dies used in the business to release such dies to the Purchaser or otherwise deal with such dies as the Purchaser may direct." Arrow Master claims it carried out that requirement by sending this letter:

> To Whom It May Concern:
> This is to certify that AJV Tool of Toronto Canada has purchased all rights and tooling of Arrow Master vibrator line. Any questions please feel free to contact me. Howard Grice.

The district court found "that the plaintiff complied with the provisions of paragraph 9(c) by not only notifying foundries but all vendors of the sale of these assets." R. 25 at 3. It also pointed out that the contract, written on Unique stationery, was drafted by

---

6. Counsel for Unique specified at oral argument that ¶ 6(c) referred only to inventory at the Arrow Master plant that was shipped to Unique. The parties' responses to the panel's questions made

clear that neither party found that paragraph to be ambiguous; both understood it to require delivery of the items at Arrow Master's facility, not items in the possession of third parties.

Mr. Sabato, and must be construed against its writer. *Id.*

Unique asserts that the district court erred in so concluding. It points out that the sole act of compliance by Arrow Master, the "To Whom It May Concern" letter, did not identify the purchaser as Unique, but rather as AJV Tool. Moreover, the letter did not give Unique's address, the name of a contact person, the type of vibrator purchased, or the materials to be sent to Unique. In short, asserts Unique, there were no instructions or directions, as required by paragraph 9(c). Nor were records kept that would reflect which suppliers were sent the letter. Because none of the manufacturing materials in the hands of third parties was sent to the defendant, and because Unique could not produce the concrete vibrators they purchased without those materials, Unique insists that Arrow Master materially breached its contract, or did not substantially perform under it. Unique also contends that paragraph 9(c), referring only to "dies" rather than all manufacturing materials, is ambiguous.

### .1.

■ . We have reviewed paragraph 9(c) and believe it is clear and unambiguous. The paragraph requires Arrow Master to inform the foundries (not manufacturing companies in general, as Unique now asserts) either to release to Unique Arrow Master's dies (not all manufacturing materials, as Unique also now claims), or to dispose otherwise of those dies as Unique directs. The express language of that provision is not ambiguous; the "clear and ordinary meaning of the language indicates the [parties'] intent." *Borys v. Rudd,* 207 Ill.App.3d 610, 152 Ill.Dec. 623, 627–28, 566 N.E.2d 310, 314–15 (1990). The mere fact that parties may not agree upon the meaning of the terms of a contract (such

as the definition of "dies") does not create an ambiguity. *See Hickox v. Bell,* 195 Ill. App.3d 976, 142 Ill.Dec. 392, 401, 552 N.E.2d 1133, 1142 (1990) (finding no ambiguity in express language of agreement, despite fact that parties do not agree on meaning of terms of contract). Nor does the fact that Arrow Master notified all its suppliers, rather than just the foundries holding its dies, lead to the conclusion that the contract is ambiguous.[7]

### 2.

■ Having determined that the meaning of paragraph 9(c) is clear, we turn to the question whether Arrow Master substantially performed its requirements. It is well established in Illinois that "only a *material* breach of a contract provision will justify non-performance by the other party." *Borys v. Rudd,* 152 Ill.Dec. at 628, 566 N.E.2d at 315 (collecting cases). "The determination of whether a party has committed breach of contract is a question of fact, which will not be disturbed on review unless the finding is against the manifest weight of the evidence." *Id.* (collecting cases). "Whether a breach is material, thereby discharging the other party's duty to perform, is an issue to be determined based on the inherent justice of the matter." *Rogers v. Balsley,* 240 Ill.App.3d 1005, 181 Ill.Dec. 814, 818, 608 N.E.2d 1288, 1292 (1993). "[A] minor nonmaterial breach by the plaintiff will not preclude specific performance." *Regan v. Garfield Ridge Trust & Sav.,* 220 Ill.App.3d 1078, 1084, 581 N.E.2d 759, 765 (1991) (citing cases).

■ Under Illinois law, the test for determining whether failure of performance constitutes a material breach was clearly enunciated in *Haisma v. Edgar,* 218 Ill.App.3d 78, 161 Ill.Dec. 36, 578 N.E.2d 163 (1991):

---

7. At trial, Unique presented the testimony of representatives from five of Arrow Master's suppliers to show that the suppliers did not receive Arrow Master's letter. Although Unique claims that four of the five witnesses testified that they had no record of the letter, Arrow Master produced evidence that two of them did have a copy of the letter. We note, as well, that the testimony of two other representatives indicated that they did not know whether the company had received

the letter. After reviewing all the evidence, the magistrate judge found that "it is established by credible testimony that plaintiffs did send a form letter" to the suppliers informing them that "all rights and tooling of Arrow Master vibrator line" had been sold. R.25 at 2. Nothing in the record or in the arguments presented by Unique to this court indicates that this finding was clearly erroneous.

[A] court must ask whether "the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it."

*Id.* 161 Ill.Dec. at 41, 578 N.E.2d at 168 (quoting *Trapkus v. Edstrom's, Inc.*, 140 Ill. App.3d 720, 95 Ill.Dec. 119, 124, 489 N.E.2d 340, 345 (1986)). In other words, we ask whether the performance of that provision "was a *sine qua non* of the contract's fulfillment." *Sahadi v. Continental Ill. Nat'l Bank & Trust Co.*, 706 F.2d 193, 198 (7th Cir.1983). Under that standard of evaluation, we examine the record for evidence of the extent of the parties' performance or lack thereof. As Judge Wood described the task in *Sahadi:*

> [T]he determination of "materiality" is a complicated question of fact, involving an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal nonperformance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage.

*Id.* at 196.

The district court considered documents and testimony to determine whether the parties had substantially performed under the contract. That evidence indicates, as the district court noted, that Arrow Master went beyond the specific requirements of paragraph 9(c) by notifying all vendors, not just foundries holding Arrow Master's dies, of the sale of its assets. It is clear from Mr. Sabato's testimony at trial that Unique wanted all suppliers notified and all manufacturing materials (not just dies) released to Unique. *See* Tr. at 187–92. The evidence of record supports the conclusion that Arrow Master's performance met and exceeded its obligation under the contract concerning general notification to the outside suppliers holding its manufacturing materials.

However, the notice provision also contained the more specific requirement that Arrow Master direct the supplier to release its dies to the purchaser or to follow the purchaser's direction concerning the dies.[8] Unique informs the court that Arrow Master's letter to the suppliers misidentifies the purchaser and does not tell them what to do with the materials. Returning, therefore, to the test enunciated in *Haisma*, we consider whether Arrow Master's failure to provide the directions required in paragraph 9(c) was of such importance that Unique would not have made the contract without that element.

Our review of the evidence leads us to conclude that the district court's determination that the lack of more specific information was not a material breach of the contract is not against the manifest weight of the evidence. Lack of direction in Arrow Master's letter was not of such great importance to Unique. As his testimony demonstrated, Mr. Sabato had understood, prior to contracting for the purchase of Arrow Master, the circumstances concerning the outside location of the manufacturing materials.[9] He

---

8. Paragraph 9(c) of the contract does not mandate that the notice include such specific information as Unique's address or the name of a contact person there, as Unique claims.

9. Mr. Sabato's testimony on this issue was as follows:

> Q. Before that contract was signed, what, if anything, did you tell Mr. Kirkman, Harris and Gustafson about the subject of dies, castings, fixtures, molds necessary to produce the parts for the concrete vibrators being purchased?
> A. Having discussed, we were there to purchase the business, of course, the business is in the spectrum of everything, parts, inventory, and then we knew that there had to be dies and molds and parts and everything else, so we ask.

They told me lots in the factories available. I said, "Okay, fine. I would like to have all the dies. When you ship the equipment, I would like to ship all the dies, molds," and then they say, "We cannot do that because of part of the dies, they are spread around the country, and they are in the foundry of the company making parts for us."

> Q. What did you say to that?
> A. To them I said, I really would like to have all the dies because if we are going to pay now, we would like to have them delivered as soon as you would deliver the equipment. But if—because they were still operating, they were fulfilling orders, they were still selling vibrators, but if you need a couple weeks, because we need some time to set up, if you need a couple weeks to direct all the foundries to

was aware that many of the manufacturing parts were available in other factories. Tr. at 186–88. In fact, he testified that he intended to compare the costs of manufacturing various parts in Canada and in the United States, and would leave the dies and other materials in the United States if he could make the parts more cheaply there. "If those parts were going to be more economical to be made in the States, we were going to leave the dies in the States." Tr. at 188–89. Because Mr. Sabato wanted the option of choosing to have the parts made in the foundries where the dies were already located if it was beneficial to his company, he presumably did not want the dies and other materials delivered to Canada before making that decision. For this reason paragraph 9(c) contained an option: Unique could either demand the release of the manufacturing materials or give another direction to the suppliers, like an order for a certain part. The choice on the course of action was Unique's. In light of Mr. Sabato's testimony, we conclude that Arrow Master's letter, simply alerting its suppliers to the fact that Arrow Master had sold all rights and tooling of its vibrators, was adequate performance under the contract.[10]

Unique also notes that Arrow Master misidentified the purchaser as AJV Tool, another of Mr. Vecchio's companies, rather than as Unique. It is noteworthy that Unique had received a copy of the letter sent to Arrow Master's suppliers, Tr. at 137–38, and neither complained of its inadequacy nor requested that clarifying or supplementary information be sent to suppliers. Indeed, Unique did not clearly demand such specific performance as revising the letter prior to refusing to make further payment under the contract. Without giving Arrow Master such clear notice

and an opportunity to correct the error, Unique was not in a position to charge that Arrow Master had committed a material breach and to stop payment under the contract. See Omni Partners v. Down, 246 Ill. App.3d 57, 185 Ill.Dec. 657, 662, 614 N.E.2d 1342, 1347 (1993) (finding no material breach when defendant's overall conduct lulled plaintiff into false sense of security); Tantillo v. Janus, 87 Ill.App.3d 231, 42 Ill.Dec. 291, 296, 408 N.E.2d 1000, 1005 (1980) (holding that acceptance of delays, coupled with absence of demand to perform, resulted in waiver and thus no material breach of contract); Kitsos v. Terry's Chrysler–Plymouth, Inc., 70 Ill. App.3d 728, 27 Ill.Dec. 91, 94–95, 388 N.E.2d 1054, 1057–58 (1979) (holding that, when specified date of performance is waived, the date is extended to a reasonable time which becomes a question for the trier of fact).

The purpose of a notice provision is to ensure that the party is informed and the message was delivered. Rogers v. Balsley, 181 Ill.Dec. at 818, 608 N.E.2d at 1292; see also Hickox, 142 Ill.Dec. at 403, 552 N.E.2d at 1144 (concluding that a failure to deliver notice is not a material breach). The district court concluded that the suppliers were notified of the sale of the business "to the defendants [sic] firms" by means of a form letter to those companies. Although it would have been preferable for the district court to have addressed the matter in a more straightforward fashion, we believe that, in the context of this litigation, the failure of the district court to distinguish between the names Unique and AJV Tool evidences the court's conclusion that the misdesignation was more technical than substantial. That conclusion was fairly supported by the record.

send you the dies and send them to us, or send to us the dies waiting for our order, or whatever you want to do with these dies, that's fine, I will go along on that basis that when we go back to Toronto, we will inquire economics about whatever it was parts those dies were producing, and if those parts were going to be more economical to be made in the States, we were going to leave the dies in the States.

If the company produced a part for a dollar and I can find a company in Toronto that

would produce it for ninety cents, I would want the dies in Toronto. If Toronto is a dollar ten, I leave it in the States because it is convenient economically.

Tr. at 187–89.

10. Arrow Master also sent to Mr. Vecchio lists of the names and addresses of all the suppliers holding Arrow Master's dies, tooling, and patterns. Mr. Vecchio testified that he knew the location of the manufacturing items in the hands of third parties. Tr. at 141.

In sum, we conclude that Arrow Master did not commit a material breach of the contract. Therefore Unique was not justified in refusing to continue its payments on the promissory note. Accordingly, the judgment of the district court is AFFIRMED.

AFFIRMED.