**ARCHER-DANIELS-MIDLAND COMPANY, Reidy Terminal, Inc., ADM/Growmark River System, Inc., American River Transportation Co., ADM Milling Co., Collingwood Grain, Inc., Tabor Grain Co., Plaintiffs,**

v.

**PHOENIX ASSURANCE COMPANY OF NEW YORK, Commonwealth Insurance Company, Navigators Insurance Company, Albany Insurance Company, Hartford Fire Insurance Company, Defendants.**

No. 95–CV–4001–JLF.

United States District Court, S.D. Illinois.

Aug. 4, 1997.

---

Michael J. Kehart, A. James Shafter, Kehart, Shafter & Webber, P.C., Decatur, IL, Aubrey M. Daniel, III, James W. Shannon, Jr., Philip A. Sachler, J. Gordon Seymour, Williams & Connolly, Washington, DC, for Plaintiffs.

Maynerd I. Steinberg, Daniel J. Zollner, Lord, Bissell & Brook, Chicago, IL, Carl L. Favreau, Campbell, Black, Carnine & Hedin, Mt. Vernon, IL, Eric C. Young, Dunham, Boman & Leskera, East St. Louis, IL, Harry P. Cohen, Richard M. Appel, Michael Verde, Steven E. Goldman, Kathleen E. Schaaf, Rosenman & Colin, New York City, Donald V. Ferrell, Jelliffe, Ferrell, Morris, Doerge & Foster, Harrisburg, IL, Charles M. Fraenkel, Leahy, Eisenberg & Fraenkel, Chicago, IL, for Defendants.

### MEMORANDUM AND ORDER

FOREMAN, District Judge:

Before the Court is Defendant Phoenix's "Motion for Partial Summary Judgment for Post–July 1, 1993 Losses and Losses Caused by Delay" filed pursuant to Federal Rule of

Civil Procedure 56 (Doc. 87). Archer Daniels Midland Company and its subsidiaries (collectively, "ADM") have filed a response (Doc. 120) and Phoenix has filed a Reply (Doc. 126). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

## I. *Introduction.*

For a discussion of the facts leading to this litigation see *Archer–Daniels–Midland Co. v. Phoenix Assur. Co. of New York*, 936 F.Supp. 534, 536 (S.D.Ill.1996).

## II. *Background.*

Phoenix Assurance Company of New York sold ADM a Marine Policy to insure its watercraft and marine operations against certain hazards or risks for the period July 1, 1992 to July 1, 1993. Phoenix seeks a ruling on the following two issues:

A. Does the Marine Policy cover losses, damages or expenses incurred after July 1, 1993?

B. Does the Marine Policy cover losses, damages or expenses caused by delay in shipment?

Phoenix's motion does not seek a determination or ruling as to coverage for particular claims submitted by ADM, rather, Phoenix merely seeks an interpretation or ruling as to the contract language.

## III. *Interpretation of the Policy.*

■ Contract interpretation is particularly suited to disposition by summary judgment. *Metalex Corp. v. Uniden Corp. of America*, 863 F.2d 1331 (7th Cir.1988). Summary judgment is appropriate where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. Because neither party has raised the issue of choice of law in this diversity action, the Court will apply the substantive law of Illinois, the forum state. *Travelers Ins. Cos. v. Penda Corp.*, 974 F.2d 823, 827 (7th Cir.1992) (citing *Wood v. Mid–Valley, Inc.*, 942 F.2d 425, 426–27 (7th Cir.1991)).

The construction of an insurance policy and its provisions is a question of law. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 699, 607 N.E.2d 1204, 1212 (1992). In construing an insurance policy, the Court's task is to ascertain the intent of the parties to the contract, "with due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract." *Id.* (citations omitted). If the policy language is unambiguous, there is no issue of material fact, and the Court must determine the contract's meaning as a matter of law affording the contract language its plain, ordinary, and popular meaning. *Id.* But if the Court determines that the contract is ambiguous, the contract's meaning is a question of fact. *Dash Messenger Serv., Inc. v. Hartford Ins. Co. of Ill.*, 221 Ill.App.3d 1007, 164 Ill.Dec. 313, 316, 582 N.E.2d 1257, 1260 (1st Dist. 1991.), *appeal denied*, 143 Ill.2d 637, 167 Ill.Dec. 398, 587 N.E.2d 1013 (1992).

■ Neither party has argued that the Policy language at issue is ambiguous. Instead, the parties argue for different interpretations based on the plain and ordinary meaning of the Policy language. A policy provision is ambiguous only if it is subject to more than one reasonable interpretation. *Lapham–Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 166 Ill.2d 520, 211 Ill.Dec. 459, 463, 655 N.E.2d 842, 846 (1995) (citing *United States Fidelity & Guar. Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926 (1991)). A policy term is not ambiguous merely because the parties can suggest creative possibilities for its meaning. *Id.* (citations omitted).

### A. *Does the Marine Policy Cover Losses, Damages or Expenses Incurred after July 1, 1993?*

■ Phoenix seeks a ruling that the Marine Policy does not cover any losses, damages or expenses that were incurred after July 1, 1993. Phoenix argues that by its terms, the Marine Policy expired on July 1, 1993, and that no losses that occurred after July 1, 1993 are covered.

■ ADM argues that certain losses and expenses that occurred after July 1, 1993 are covered *if* the underlying shipment began loading prior to July 1, 1993. In other

words, ADM argues that as long as the cargo was loaded prior to July 1, 1993, any related losses (and related sue and labor expenses) are covered even though the Policy itself expired on July 1, 1993.

In reply, Phoenix reiterates that the Policy expired on July 1, 1993, and that the Policy clearly provides that if ADM wanted to extend coverage beyond this date, ADM could have done so by providing notice to Phoenix and by paying an additional pro rata monthly premium. Phoenix argues that the Marine Policy is divided into six different sections. Section I is entitled "General Conditions." This General Conditions Section has an Attachment clause which states that the Policy shall attach for a certain time period as follows:

### Section I

### General Conditions

*Attachment:*

At or from the 1st Day of July, 1992, Noon Central Standard Time to the 1st day of July, 1993, Noon, Central Standard Time.

(Doc. 120, Exh. 9, Sec. I, p. 1).

The General Conditions Section also contains a Duration of Risk clause which provides:

*Duration of Risk:*

1. Should the vessel at the expiration of this policy be at sea, or in distress, or at a port of refuge or of call, she shall, provided previous notice be given to this Company, be held covered at a pro rata monthly premium to her port of destination.

(Doc. 120, Exh. 9, Sec. 1. p. 2).

Based on these provisions, Phoenix argues that the Policy expired on July 1, 1993 and that to extend coverage beyond that date, ADM had to give notice to Phoenix and had to pay an additional pro rata monthly premium.

ADM argues, however, that the Policy contains language which suggests that as long as a shipment was loaded before July 1, 1993, the losses and expenses related to that shipment are covered, even if those losses and expenses were incurred *after* July 1, 1993.

Specifically, ADM looks to Section VI of the Policy which is entitled "Cargo Insurance." Section VI insures:

### Section VI

### Cargo Insurance

*Goods Insured:*

... goods and/or merchandise of every description but consisting principally of grain, soybeans, flour and their products ... shipped by or to the Assured ...

(Doc. 120, Exh. 9, Sec. VI, p. 1).

Section VI also has an Attachment clause which states that it shall:

*Attachment Clause:*

... attach in respect of all shipments the loading of which commences during the term of this policy.

(Doc. 120, Exh. 9, Sec. VI, p. 2).

Based on this Attachment clause, ADM argues that as long as the loading of the shipment occurred before July 1, 1993, any losses related to those shipments are covered, even though the losses themselves occurred *after* July 1, 1993.

At issue is whether the Marine Policy covers any losses or expenses that occurred after July 1, 1993. Phoenix argues that Section I's General Conditions apply to all provisions of the Policy, (hence, the name "General Conditions"). Accordingly, Phoenix argues that Section I's Attachment and Duration of Risk clauses govern the entire Policy. Phoenix also argues that these clauses do not conflict with Section VI's Attachment clause, rather, the clauses merely address different topics. Specifically, Phoenix argues that the purpose of Section VI's Attachment clause is to address only when the Policy attaches to certain commodities, such as grain. Phoenix explains that the Marine Policy does not apply to grain stored on land or in an elevator, thus, the purpose of Section VI's Attachment clause is to specify that the Policy attaches to the grain only when the grain becomes cargo, (i.e., when the loading of a shipment commences). Section I's Attachment and Duration of Risk clauses, according to Phoenix, address the question of when the entire policy terminates, and are therefore the overall govern-

ing provisions regarding the duration of risk.[1]

Under general rules of contract construction, " 'contracts are to be interpreted as a whole, giving meaning and effect to each provision of the contract.' " *Arrow Master, Inc. v. Unique Forming Ltd.,* 12 F.3d 709, 713 (7th Cir.1993) (*quoting Mayfair Constr. Co. v. Waveland Assoc. Phase I Ltd. Partnership,* 249 Ill.App.3d 188, 188 Ill.Dec. 780, 788, 619 N.E.2d 144, 152 (1st Dist.1993), *appeal denied,* 153 Ill.2d 561, 191 Ill.Dec. 621, 624 N.E.2d 809 (1993)). Phoenix's interpretation of the Policy is persuasive because it construes the provisions harmoniously and gives effect to all of the Policy provisions. ADM's interpretation, in contrast, is illogical for at least two reasons. First, Section VI's Attachment clause states only that it will "attach in respect of all shipments the loading of which commences during the term of this policy." Nowhere does this Section, unlike Section I, provide any specific dates of coverage (Doc. 120, Exh. 9, Sec. VI, p. 2). Secondly, ADM's interpretation would result in an irreconcilable conflict between the Attachment and Duration of Risk clauses in Section I, and the Attachment clause in Section VI. "In construing a contract, it is presumed that all provisions were inserted for a purpose, and conflicting provisions will be reconciled if possible so as to give effect to all of the contract's provisions." *Id. (quoting Mayfair Constr. Co.,* 188 Ill.Dec. at 788, 619 N.E.2d at 152) (internal quotation marks omitted). Phoenix's construction of the Policy gives effect to all of the contract's provisions and is therefore the more reasonable construction.

Furthermore, and perhaps more importantly, according to *Couch On Insurance,* Marine Policies are divided into three categories based on "(1) the time, as where the risk

begins and terminates ... without regard to the actual situation of the ship; (2) the voyage, the places of beginning and ending, ... being described or defined and ascertainable; and (3) both the voyage and the time, the beginning and end of the risk depending upon the time specified, the risk relating to a certain voyage." 9 *Couch On Insurance* 2d § 39:286 (Rev. ed. 1985). *See also Vizzini v. Insurance Company of North America,* 260 Md. 626, 273 A.2d 137, 139 (1971) ("Policies of marine insurance are generally written for a voyage, ... for a specified period of time, ... or on a 'mixed' basis, setting forth both a time limitation upon the duration of the risk, *and* specifying the voyage covered.") (citations omitted) (emphasis added).

As a general rule, the duration of a marine risk depends on "whether the policy is a time policy, a voyage policy or a mixed policy ..." 9 *Couch On Insurance* 2d § 39:286. A "time" policy is a policy that continues for the duration of time specified in the policy, a "voyage" policy continues for the duration of a specified voyage, and a "mixed" policy is a policy that sets forth both a time limitation upon the duration of the risk and specifies the journey covered. 9 *Couch On Insurance* 2d §§ 39:287–39:293.

The parties have not indicated whether the Marine Policy at issue is a time, voyage, or mixed policy. The Attachment clause in Section I's General Conditions clearly sets forth a time limitation indicative of a time policy. Although the Policy identifies specific vessels to be insured, nowhere does the Policy state that it continues for the duration of a specific voyage or voyages. Accordingly, the Policy appears to be a time policy and would thus expire at the end of the time period specified unless ADM renewed the Policy or extended this time period by providing notice and by paying an additional premium. Even if the

---

1. Phoenix supports its position by revealing that in a September 27, 1993 internal memorandum to ADM/Growmark, Vern Torrens, ADM's Director of Property and Casualty Insurance, admitted with respect to the Marine Policy that, "After 7/1 we are self-insured." Phoenix also supports its position by arguing that rather than extend Phoenix's Policy beyond July 1, 1993 by paying an additional premium, ADM purchased a Marine Policy from Agrinational which covered the period July 1, 1993 to July 1, 1994.

As noted earlier, neither party has argued that Phoenix's Marine Policy is ambiguous. "[I]f a contract is 'in writing, is unambiguous and contains no uncertain terms, interpretation of the contract is a question of law for the court,' and no evidence outside the four corners may be employed to construe its terms." *Arrow Master, Inc. v. Unique Forming Ltd.,* 12 F.3d 709, 711 (7th Cir.1993) (citations omitted). Accordingly, Phoenix's additional evidence will not be considered.

Policy were a "mixed" policy, coverage would end at the Policy's July 1, 1993 expiration date, whether or not any voyage specified had been completed. *See Vizzini,* 273 A.2d at 139 (Under a mixed policy, the risk covered has been held to end at the expiration of the time specified, whether or not the voyage has been completed) (citations omitted); *see also* 9 *Couch On Insurance* 2d § 39:293 (same). For the reasons set forth above, Phoenix's Motion for a ruling that the Marine Policy provides no coverage for any losses, damages, or expenses incurred after July 1, 1993 is granted?[2]

### B. *Does the Marine Policy Cover Cargo Losses, Damages or Expenses Due to Delay of the Barges?*

During the Flood of 1993, the United States Coast Guard halted barge traffic on the Mississippi River due to flooding (Doc. 126, p. 15). As a result, many of ADM's barges were delayed and the grain on the barges deteriorated. ADM has sought coverage for the losses stemming from this grain deterioration by submitting claims under the Marine Policy.

Phoenix seeks a ruling that the Marine Policy does not cover losses, damages and expenses due to shipping delays. Specifically, Phoenix argues that the Policy contains several clauses that specifically exclude losses, damages and expenses caused by "delay." In response, ADM argues that these clauses do not apply because the losses were not caused by a "delay," but were caused by the Flood which is an insured peril under the Policy. Specifically, ADM argues that even if the halting of barge traffic by civil authorities falls within these exclusionary clauses, the "proximate cause" of ADM's losses, damages and expenses was not the halting of the barges, but, rather, was the Flood which caused the halting of the barges in the first place. Because the Flood is an insured peril,

ADM argues, any resulting losses, damages and expenses are covered by the Policy.

Phoenix argues that four clauses exclude losses, damages and expenses caused by delay. These clauses are all located in the Marine Policy's Cargo Insurance Section, Section VI, and are discussed individually below.

### 1. *Free From Capture and Seizure (FC & S) Clause.*

█   Phoenix argues that ADM's losses are excluded by the "Free From Capture and Seizure" (FC & S) clause. This clause states that:

Section VI

Cargo Insurance

*F.C. & S. Warranty*

30. Notwithstanding anything contained herein to the contrary this insurance is warranted free from:

(a) capture, seizure, arrest, *restraint, detainment,* confiscation, preemption, requisition or nationalization, and the consequences thereof or any attempt thereat, whether in time of peace or war and whether lawful or otherwise,
. . .

(Doc. 20, Exh. 9, Sec. VI, p. 9) (emphasis added).

Phoenix argues that the stalling of ADM's barges on the Mississippi River was the result of a "restraint" or a "detainment." Specifically, Phoenix argues that the United States Coast Guard is a civil authority, and that its closure of the River amounted to a restraint or detainment of ADM's barges.

To support its position, Phoenix relies on *Blaine Richards & Co., Inc. v. Marine Indemnity Ins. Co. of Am.,* 635 F.2d 1051 (2d Cir.1980). In *Blaine,* the United States Food and Drug Administration (FDA) detained a shipment of beans because some of

---

2.   Phoenix has moved for a ruling that the Policy provides no coverage for any losses, damages or expenses incurred after July 1, 1993, at Noon, Central Standard Time. Although the first page of the Policy states that it attaches from "July 1, 1992 to July 1, 1993, Noon, Central Standard Time" (Doc. 20, Exh. 9, p. 1), the Policy's cover

sheet states that the period runs from "July 1, 1992 to July 1, 1993, 12:01 a.m. Eastern Standard Time" (Doc. 20, Exh. 9). ADM has not contested this inconsistency, thus, the Court adopts Phoenix's interpretation that the Policy expires at July 1, 1993, Noon, Central Standard Time.

the beans had been fumigated with a pesticide that had not received FDA approval. The Policy at issue had an FC & S clause identical to the clause above. Reviewing this language, the Second Circuit Court of Appeals concluded that the FDA's "hold" on the beans was a "seizure" or "detention" within the meaning of the FC & S Clause.

Phoenix argues that there is no difference between the FDA's hold in *Blaine* and the Coast Guard's closing of the river resulting in the restraint or detention of ADM's barges. Consequently, Phoenix argues, the FC & S Clause applies and damage to the grain during the period of restraint or detainment is excluded by the Policy. ADM, however, argues that the FC & S clause does not exclude coverage. Specifically, ADM argues that the FC & S clause is addressed to acts of war, is not intended to exclude the risk of detention by civil authorities in peaceful circumstances, and is therefore inapplicable.

Contrary to Phoenix's position, the FC & S Clause does not exclude coverage. Contrary to ADM's position, the FC & S Clause does not fail to exclude coverage because it is addressed solely to acts of war. The plain language of the FC & S Clause states that it excludes coverage against capture, seizure, arrest, restraint, detainment, etc., *"whether in time of peace or war* and whether lawful or otherwise" (Doc. 20, Exh. 9, Sec. VI, p. 9) (emphasis added). ADM's argument wholly ignores the plain language of the clause.

■ The FC & S Clause fails to exclude coverage for a reason different from the reason cited by ADM. It is true that the FC & S clause may have originally been inserted in marine policies to protect against risks of war. In recent years, however, courts have consistently held that the FC & S clause also applies to detentions by civil authorities during peacetime. *Blaine,* 635 F.2d at 1053. Such cases are cited in *Blaine* and include: *Intermondale Trading Co. v. North River Insurance Co.,* 100 F.Supp. 128 (S.D.N.Y. 1951) (British officials detained vessel transporting tires at Gibraltar because they suspected the ship was also carrying illegal ref-

ugees bound for Palestine); *Nakasheff v. Continental Insurance Co.,* 89 F.Supp. 87 (S.D.N.Y.1950) (detention by United States Customs officials); and *Resin Coatings Corp. v. Fidelity & Casualty Co. of New York,* 489 F.Supp. 73 (S.D.Fla.1980) (detention by Saudi Arabian Customs officials).

Unlike the examples of restraint or detention detailed in *Blaine,* the United States Coast Guard's closing of the Mississippi River hardly seems to be a civil "restraint" or "detention." Marine policies typically include coverage against "arrest, restraints, and detainments ..." 9 *Couch On Insurance* 2d § 43:6. These three types of interferences are distinguished as follows:

> An arrest operates immediately on the subject arrested; so does a detainment; for it supposes the subject detained to be in the hands of the detainer. But there may be a restraint where the subject restrained is not in the hands of the restrainer ... Neutrals are often arrested and carried into port for the purpose of investigation. An embargo is a detainment as well as a restraint. But a blockade may be a restraint without arrest or detainment.

*Couch On Insurance* 2d § 43:10.

The United States Coast Guard's closing of the river did not operate "immediately on any subject" in the sense that "the subject detained was deemed to be in the hands of the detainer." Accordingly, the closing of the river would not constitute a detention. Nor would the closing constitute a restraint because restraint is "created by the application of external force, as in the case of a besieged town, or a blockading force which prevents vessels from coming out." *Couch On Insurance* 2d § 43:7. No one has alleged that the closing of the River involved any such force, thus, the closing would not amount to a civil restraint. For these reasons, the United States Coast Guard's closing of the Mississippi River is not a detention or restraint for purposes of the FC & S clause. Accordingly, the FC & S clause does not exclude ADM's losses from delays in shipment from coverage under the Marine Policy.[3]

---

**3.** As an aside, it is interesting to note that the

Averages Clause in Section VI specifically men-

**1144**

### 2. Marine Extension Clause.

Phoenix also argues that ADM's losses are excluded by one of the "Marine Extension Clauses." That clause states:

*Marine Extension Clause*

47. Notwithstanding anything to the contrary contained in or endorsed on this policy it is understood and agreed that in consideration of premium as agreed the following terms and conditions shall apply to all shipments which become at risk hereunder.

> (6) This insurance shall in no case be deemed to extend to cover loss, damage or expense proximately caused by delay or inherent vice or nature of the subject matter insured.

(Doc. 20, Exh. 9, Sec. VI, pp. 14–15).[4]

The plain language of Subparagraph (6) excludes from coverage any loss, damage or expense that is "proximately caused" by delay. For the Court to determine whether this provision excludes coverage of the losses and expenses at issue would require the Court to determine the proximate cause of the losses and expenses. If the proximate cause of these losses and expenses was "delay," then this clause would obviously exclude these losses and expenses from coverage. If the proximate cause was not delay but was the Flood, then this clause would not exclude coverage.

The Court concludes that it need not make this determination of proximate cause. As shown below, ADM's grain deterioration losses, damages and expenses are excluded from coverage by the plain language of the Delay Clause. If these losses, damages and expenses are excluded from coverage by one clause in the Policy, it does not matter

whether another of the Policy's clauses, such as the one above, also excludes coverage. To hold otherwise would mean that no exclusionary clause would ever be operative. Accordingly, the Court declines to determine whether the Marine Extension Clause excludes coverage of the losses and expenses at issue.

### 3. Averages Clause.

Phoenix also argues that ADM's losses are excluded by one of the "Averages Clauses." That clause states that:

*Averages Clauses . . .*

12. (a) Shipments of grain, flour, soybeans, etc., cement and their products, in bulk or in bags, are insured:

> To pay loss or damage from any external cause including heating and/or spontaneous combustion resulting from inherent vice, condemnation and seizure by the United Stated Food and Drug Administration or other duly constituted State or Federal Authority (but excluding those risks excepted by the Free of Capture and Seizure and Strikes, Riots and Civil Commotions Warranties, unless otherwise provided herein), but these Assurers not to be liable for any difference in weight or natural shrinkage on sound grain, or for loss, damage or deterioration resulting from delay

(Doc. 20, Exh. 9, Sec. VI, p. 4).

The plain language of Paragraph 12(a) provides coverage for loss or damage from "any external 'cause,'" but not for loss or damage "resulting from delay." Thus, this Paragraph has both inclusionary language and exclusionary language. The inclusionary language covers loss or damage from "any ex-

---

tions that damage to grain, etc., is insured against condemnation and seizure by the "United States Food and Drug Administration or other duly constituted State or Federal Authority (but excluding those risks excepted by the Free of Capture and Seizure . . . unless otherwise provided herein . . . )" (Doc. 20, Exh. 9, Sec.VI, p. 4). It appears that this insuring of losses due to FDA condemnations or seizures may have been added to the Marine Policy at the insured's insistence in response to the Second Circuit's decision in *Blaine.*

4. Although this Clause is labeled Paragraph "47," it appears that it should have been numbered Paragraph "46." There is no intervening paragraph between this one and the preceding paragraph, Paragraph 45. In addition, the paragraph immediately following this Paragraph 47 is a paragraph that is also labeled Paragraph "47." To avoid confusion, the Court's reference to Paragraph 47 is the *first* Paragraph 47 that appears in the Policy and is the Paragraph 47 that appears on pages 14–15 of the Policy rather than the Paragraph 47 that appears on pages 15–16 of the Policy.

ternal cause;" the exclusionary language excludes loss or damage "resulting from delay."

The interpretation of this provision poses even more problems than does the Marine Extension Clause. To determine whether Paragraph 12(a) covers or excludes the losses, damages and expenses at issue, the Court would first have to determine whether the word "cause" in the phrase "any external cause" means "proximate cause" or merely *any* contributing cause. Having made that determination, the Court would then have to determine whether the "cause" was one:

> resulting from inherent vice, condemnation and seizure by the United Stated Food and Drug Administration or other duly constituted State or Federal Authority (but excluding those risks excepted by the Free of Capture and Seizure and Strikes, Riots and Civil Commotions Warranties, unless otherwise provided herein), . . .

(Doc. 20, Exh. 9, Sec. VI, p. 4).

Having made this second determination, the Court would then have to determine whether coverage was excluded because the cause (or proximate cause) was one "resulting from delay, or from the moisture content of the grain itself, or other inherent vice (except as provided above)" *Id.*

All of these interpretative hurdles can be avoided for the same reason identified in the above discussion of the Marine Extension Clause. As shown below, ADM's losses and expenses are excluded from coverage by the Delay Clause. Accordingly, the Court declines to determine whether the Averages Clause excludes coverage of the losses and expenses at issue.

### 4. Delay Clause.

█ Phoenix also argues that ADM's losses are excluded by the "Delay Clause." This clause states that the Policy is:

*Delay Clause*

42. Warranted free of claim for loss of market or for loss, damage or deterioration arising from delay, whether caused by a peril insured against or otherwise.

(Doc. 20, Exh. 9, Sec.VI, p. 12).

The plain language of Paragraph 42 excludes from coverage, "loss, damage or deterioration arising from delay, *whether caused by a peril insured against or otherwise.*" *Id.* (emphasis added). This somewhat inartful wording means that loss, damage or deterioration is excluded from coverage if it arises from delay, whether the *delay* is caused by a peril insured against or otherwise. *See generally, Blaine Richards & Co. v. Marine Indemnity Insurance Co.*, 635 F.2d 1051 (2d Cir.1980).

█ As noted earlier, ADM argues that this Delay Clause has no applicability because the "proximate cause" of ADM's losses was not "delay" but was the Flood which caused the delay in the first place. In other words, ADM argues that the delay was caused by the closing of the River, and the closing of the River was caused by the Flood. Thus, according to ADM, the proximate cause of the losses and expenses was the Flood and the Delay Clause does not apply.

ADM cites two cases in support of its argument that the Delay Clause does not apply. The first is *Brandyce v. United States Lloyds,* 207 A.D. 665, 203 N.Y.S. 10, *aff'd,* 239 N.Y. 573, 147 N.E. 201 (1924). In *Brandyce,* the insured had a Marine Policy that covered a cargo of potatoes that was being shipped from New York to Cuba. While at sea, the ship collided with an unknown object. As a result of the collision, the ship had to be put into Charleston, South Carolina for repairs. While the ship was being repaired, the potatoes began to rot and had to be sold at a discount.

ADM cites *Brandyce* for the proposition that "mere delay" is different from a "delay *caused by an insured peril.*" Specifically, *Brandyce* stated:

> [I]f the [ship] had not been damaged by reason of sea perils, the potatoes would have arrived sound. The proximate cause of the loss, therefore, was the sea peril, because it was the efficient dominant cause which, although incidentally involving delay, placed the cargo in such a condition that, because of inevitable deterioration or decay, it could not be reshipped and carried to its destination.

*Brandyce*, 203 N.Y.S. at 11–12.

ADM argues that just like in *Brandyce*, the cause of the delay in this case was an insured peril, (the Flood), therefore, the related losses and expenses are covered under the Policy. ADM's reliance on *Brandyce* ignores the plain language of the Policy and is therefore misplaced. The plain language of the Cargo Insurance Section's Delay clause clearly states that the Policy is:

> Warranted free of claim for loss of market or for loss, damage or deterioration arising from delay, *whether caused by a peril insured against or otherwise.*

(Doc. 20, Exh. 9, Sec. VI, p. 12) (emphasis added).

According to Phoenix, this Delay Clause was added to all Marine policies during the 1940s in response to the United States Supreme Court's decision in *Lanasa Fruit v. Universal Ins. Co.*, 302 U.S. 556, 58 S.Ct. 371, 82 L.Ed. 422 (1938). Phoenix is correct in this regard. *Lanasa Fruit* held that the spoiling of a cargo of bananas was proximately caused by the stranding of a vessel—and was therefore covered by a marine policy. *Lanasa Fruit*, 302 U.S. at 572, 58 S.Ct. at 378. In response, the above Delay clause was added to marine policies to avoid this result in future litigation. See Leslie J. Buglass, *Marine Insurance and General Average in the United States*, pp. 79–81 (2d Ed. 1981). *Brandyce* was decided before *Lanasa Fruit* and is therefore inapplicable.

ADM's second case is *Blaine Richards & Co. v. Marine Indemnity Insurance Co.*, 635 F.2d 1051 (2d Cir.1980). As noted earlier, in *Blaine*, the FDA detained a shipment of beans because they had been sprayed with a pesticide that the FDA had not approved. The beans were insured by a marine policy that had a Delay Clause identical to that in Phoenix's Marine Policy.

The Delay Clause in *Blaine* excluded coverage of claims "for loss of market or for loss, damage or deterioration arising from delay, whether caused by a peril insured against or otherwise." *Blaine*, 635 F.2d at 1052. ADM argues that *Blaine* somehow suggests that this clause does not mean what it says. ADM argues that the *Blaine* court

noted that it must look behind the mere fact of a "delay" to determine the cause of the delay (and therefore the proximate cause of the loss).

A careful reading of *Blaine*, however, suggests a different result. In *Blaine*, Blaine Richards & Co. bought 10,400 bags of peabeans from a supplier in France. Because the beans had been originally harvested in Ethiopia and Chile, the supplier agreed to have the beans fumigated prior to the ocean voyage. When the beans arrived in Baltimore, an FDA inspector discovered an empty can of fumigant in the vessel as well as some fumigant powder on some of the bags of beans. Some of the bags of beans appear not to have been fumigated or did not have any residue. The FDA issued a detention notice giving Blaine Richards ten days to respond. Over six weeks later, Blaine Richards submitted a plan to clean and rebag the fumigated beans. The FDA approved the plan and immediately released 9,387 bags of the clean beans.

While the FDA was detaining the beans, many of Blaine Richards' bean contracts were canceled and Blaine Richards had to sell the beans at lower prices. The insurer argued that the losses due to the delay when the FDA detained the beans was excluded by the Delay Clause. In contrast, Blaine Richards argued that the proximate cause of the loss was not the FDA detention but was the improper fumigation with an unapproved pesticide which was a fortuitous external event covered by the Policy.

In analyzing the situation, the Court found that Blaine Richards suffered two types of losses: 1) the temporary physical loss of the beans during the period of detention (and the resulting inability to fulfill the bean contracts); and 2) the physical damage due to the beans via fumigation with an unapproved pesticide which rendered the beans unmarketable in the United States. With regard to the clean beans, *Blaine* found that recovery for delay due to detention was barred by the Delay Clause. With regard to the beans that had residue, the Court found that the exemptions of the policies, including the Delay Clause, would preclude recovery for losses caused by delay in shipment due to the

FDA's detention. The Court also found, however, that damage to the beans from the fumigation (which occurred *prior* to the FDA delay) may have been covered by the policy and remanded the case for that determination. Accordingly, *Blaine* actually supports Phoenix's rather than ADM's position because *Blaine* gave full effect to the plain meaning of the Delay Clause. *Blaine*, 635 F.2d at 1056.

In summary, the Delay Clause in the Policy at issue clearly states that losses arising from delay are excluded *whether caused by a peril insured against or otherwise.* (Doc. 20, Exh. 9, Sec. VI, p. 12) (emphasis added). Prior to the addition of this italicized language, cases such as *Brandyce and Lanasa Fruit* suggested that losses caused by delay are covered if the delay was caused by an insured peril. With the addition of this language, however, it is irrelevant whether the delay was caused by an insured peril. Here, the losses and expenses sought to be excluded fall squarely within the plain language of the Delay Clause. The losses and expenses at issue "arose" from delay. *Whether or not this delay was caused (proximately or otherwise) by a peril insured against,* the losses and expenses arose from delay and are therefore excluded from coverage. To hold otherwise would give the Delay Clause no meaning and would render it a nullity. It is well established that " 'contracts are to be interpreted as a whole, giving meaning and effect to each provision of the contract.' " *Arrow Master, Inc. v. Unique Forming Ltd.,* 12 F.3d 709, 713 (7th Cir.1993) (*quoting Mayfair Constr. Co. v. Waveland Assoc. Phase I Ltd. Partnership,* 249 Ill.App.3d 188, 188 Ill.Dec. 780, 619 N.E.2d 144, 152 (1st Dist.), *appeal denied,* 153 Ill.2d 561, 191 Ill. Dec. 621, 624 N.E.2d 809 (1993)). In construing a contract, it is presumed that all provisions were inserted for a purpose. *Id.* If the plain and ordinary meaning of the Delay Clause were not given effect, the Court cannot imagine what other language the parties could use to eliminate coverage for losses that arose from delay which resulted from an insured-against peril. Consequently, Phoenix's request for a ruling that the Marine Policy provides no coverage for loss, damage or expense arising from delay in shipment is granted.

## IV. *Summary.*

The Court finds that the language of the Marine Policy relevant to the issues before the Court is unambiguous. The Court further finds that the Marine Policy provides no coverage for any losses, damages or expenses incurred after July 1, 1993 at Noon, Central Standard Time, nor does it provide coverage for losses, damages or expenses arising from delay in shipment. Accordingly, Phoenix's Motion for Partial Summary Judgment for Post–July 1, 1993 Losses and Losses Caused by Delay (Doc. No. 87) is **GRANTED.**

**IT IS SO ORDERED.**