INTERVISUAL COMMUNICATIONS,
INC., Plaintiff,

v.

John K. VOLKERT and One–
Up, Inc., Defendants.

No. 96 C 2740.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 4, 1997.

Wood, Phillips, VanSanten, Hoffman & Eertel, Richard S. Phillips, Chicago, IL, for plaintiff.

Tilton, Fallon, Lungmus & Chestnut, Jerome F. Fallon, Chicago, IL, for defendants.

## *MEMORANDUM OPINION AND ORDER*

KEYS, United States Magistrate Judge.

This matter is before the Court on Plaintiff's Complaint, seeking declaratory judgment, injunctive relief, and damages for interference with prospective economic advantage and for lost profits. Additionally, Defendants have counterclaimed for de-

claratory judgment, injunctive relief, and damages based on patent infringement as well as Plaintiff's alleged failure to use its "best efforts" to market Defendants' goods. For the following reasons, the Court enters declaratory judgment in favor of Plaintiff and against Defendants. Accordingly, the Court awards $567,667 to Plaintiff for damages. Plaintiff's claims for interference with prospective economic advantage and injunctive relief fail, as do Defendants' counterclaims.

## FINDINGS OF FACT [1]

Plaintiff, Intervisual Communications, Inc., ("Intervisual"), is a Delaware corporation with its principal place of business in California. (Compl. at 2.) Intervisual markets interactive advertising devices, such as hand-assembled and machine-made "pop-ups" [2] and talking advertisements to marketing firms. (Compl. at 2.) Intervisual contracts with third parties to manufacture its advertising devices. (Compl. at 3.) Intervisual, under a succession of names, has operated in the hand-assembled pop-up market since 1962.[3] (R. at 20.)

Defendant John Volkert is an Illinois resident. (Compl. at 2.) Mr. Volkert is the president of One–Up, Inc., ("One–Up"), a separately-named defendant. One–Up is a corporation with its principal place of business in Illinois.[4] (Compl. at 2.) Mr. Volkert is an inventor and a salesman, with many years of experience designing and manufacturing machine-made pop-ups. (R. at 217; Compl. at 3.) He began working for F.N. Volkert and Company, his family's bookbinding business, in 1958. (R. at 216.) Starting out as a factory worker, Mr. Volkert rose through the ranks and eventually became president of the company. (R. at 216.) In 1982, Mr. Volkert began working for Papermasters, Inc., and One–Up, developing and licensing patents relating to creative advertising concepts. (R. at 216.) Mr. Volkert, through One–Up, currently owns as many as fifteen patents involving pop-up products and methods for making pop-ups.[5] (R. at 265; Pl.'s 12(m) Statement, ¶ 6.)

Intervisual and Mr. Volkert first developed a business relationship in 1987, when Messrs. Volkert and Richwine met and talked about merging Intervisual and One–Up. (R. at 36.) However, according to Mr. Richwine, Mr. Volkert was "having some other legal problems" at that time, so talk of merging their companies "went away." (R. at 36.) Merger discussion resumed in 1990, and, even though Mr. Volkert was still involved in litigation, Intervisual and Mr. Volkert entered into an exclusive license agreement on October 21,

1. The parties have consented to trial before a United States magistrate judge pursuant to 28 U.S.C. § 636(c), and a bench trial was held before the undersigned on May 28–29, 1997. The following constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

2. A "pop-up" is a device that, although inserted flat into books, magazines, and direct mail, opens up, dimensionally, as the reader turns the page. (R. at 24.)

3. Until two years ago, R.R. Donnelly & Sons Company, ("Donnelly"), owned ninety percent of Intervisual's stock. (R. at 42.) James Richwine, President of Intervisual, owned the remaining ten percent. (R. at 42.) Approximately two years ago, Mr. Richwine acquired (and still currently owns) one hundred percent of Intervisual's common stock. (R. at 43.) Donnelly now owns preferred stock, with an option to buy common stock, in an amount equal to twenty percent of Intervisual's total common stock offering. (R. at 43.)

4. The record is not clear as to One–Up's corporate structure. Mr. Volkert is One–Up's "chief" (and only) decision maker. As Mr. Richwine noted in his testimony, "John [Volkert] is the only one in One–Up ....'" and "One–Up is John Volkert." (R. at 42, 110.) Indeed, Mr. Volkert and One–Up maintain the same address in Northfield, Illinois. (Defs.' Answer and Countercl. at 1–2.) For the purposes of this Memorandum Opinion and Order, Mr. Volkert and One–Up will be referred to collectively as "Mr. Volkert."

5. There are three types of pop-ups referred to in this matter: "hand-made," which describes pop-ups made by hand; "machine-made," which describes pop-ups made by machine and assembled in two or more separate "operations"; and "in-line," which describes machine-made pop-ups that are assembled in one "operation." The Court notes that hand-made pop-ups are generally the sturdiest type of pop-up; machine-made pop-ups use a lighter grade of paper.

1991.[6] (R. at 36.)

This exclusive license agreement, which was amended on January 24, 1992, and renegotiated on January 20, 1993, is the focus of the dispute between Intervisual and Mr. Volkert. The essence of the 1991 agreement was that Mr. Volkert granted Intervisual the exclusive right to use and market his patents,[7] in exchange for annual royalties on the sale of any products using one of his patents. Additionally, Mr. Volkert agreed to provide his expertise to help design and manufacture pop-ups, assist in training Intervisual's sales force, develop new concepts utilizing pop-ups, attend trade shows with Intervisual, and participate in sales presentations with Intervisual. (Joint Ex. 2, Art. II.)

Specifically, the contract required Mr. Volkert to devote at least 1,380 hours per year to providing consulting services to Intervisual to support the exclusive license agreement. (Joint Ex. 2, Art. II.) In exchange, Intervisual would pay Mr. Volkert a nonrefundable sum of $50,000 upon signing the agreement. (Joint Ex. 2, Art. III.) Twenty-five thousand dollars of this $50,000 advance was to be paid directly to Mr. Volkert, and $25,000 was to be escrowed to pay for Mr. Volkert's legal costs relating to pending litigation.[8] (Joint Ex. 2, Art. III–IV.) In addition, Intervisual agreed to pay Mr. Volkert a $100,000 advance against future royalty payments and an annual license fee of $5,000 for the duration of the agreement. (Joint Ex. 2, Art. III.) Intervisual also agreed to pay Mr. Volkert annual royalties in the amount of 7% for the first $3,000,000 of annual revenue for patented pop-ups, and 5% for all such revenues thereafter. (Joint Ex. 2, Art. III.) After the fifth anniversary of the agreement, the annual royalty rate dropped to 5% on all patented pop-up revenue. (Joint Ex. 2, Art. III.)

The exclusive license agreement provided for termination, by either party, under a variety of circumstances. Mr. Volkert could terminate the agreement, upon 30–days' notice, if Intervisual did not meet a minimum level of annual sales of patented pop-ups for two consecutive years.[9] (Joint Ex. 2, Art. IV.) Intervisual had the right to terminate the agreement, upon giving Mr. Volkert twelve months' notice, after the tenth anniversary of the effective date of the agreement. (Joint Ex. 2, Art. IV.) Both parties could rightfully terminate the agreement "on thirty (30) days prior written notice if the other party is in breach of this Agreement," provided that the breaching party failed to cure "to the nonbreaching party's reasonable satisfaction during such thirty (30) day period." [10] (Joint Ex. 2, Art. IV.) Otherwise, the

6. Intervisual was known as Mobium Acquisition Corporation, ("Mobium"), at that time. Donnelly was also a party to the agreement. Donnelly and Mobium were, collectively, the licensees.

7. Included in the agreement were United States Letters Patents: No. 4,146,983, issued April 3, 1979, entitled "Promotional Pop–Up and Method"; No. 4,212,983, issued July 15, 1980, entitled "Method of Making a Promotional Novelty Device"; No. 4,313,270, issued February 2, 1982, entitled "Item with Pivoting Pop Up"; No. 4,349,973, issued September 21, 1982, entitled "Pop Ups and Methods of Making"; No.4,833,-802, issued May 30, 1989, entitled "Method of Making a Piece Containing Multiple Pop Ups"; No. 4,867,480, issued September 19, 1989, entitled "Method of Making Pop Ups with Placard Display"; No. 4,874,356, issued October 17, 1989, entitled "Method of Making a Piece Containing Multiple Pop–Ups"; and No. 4,963,125, issued October 16, 1990, entitled "Promotional Pop–Up and Method of Making". (Joint Ex. 2.)

8. Litigation then pending was with "Ib Penick and Webcraft," and concerned United States Letters Patents No. 3,995,388, issued December 7, 1976, entitled "Pop–Up Products and Method of Making," and No. 4,337,589, issued July 6, 1982, entitled "Method of Making Hinged Pop–Up Items." (Joint Ex. 2, Art. IV.) The record is silent as to whether this is the same litigation in which Mr. Volkert was involved in 1987, when Messrs. Richwine and Volkert met.

9. The minimum sales level was $500,000 in 1992 and $2,000,000 in 1993, and thereafter.

10. The agreement also provided for termination by Intervisual if the litigation pending between Ib Penick and Webcraft and Mr. Volkert had a "material adverse effect" on Mr. Volkert's business or the patent rights granted to Intervisual under the exclusive license agreement. (Joint Ex. 2, Art. IV.) Mr. Volkert was required to resolve the Ib Penick and Webcraft litigation in order to offer Intervisual the option of adding the two patents at issue in the litigation to the exclusive license agreement. (Joint Ex. 2, Art. IV.) The entire agreement would have terminated automatically had Intervisual not elected to add those two patents to the exclusive license agreement. (Joint Ex. 2, Art. IV.)

agreement would last until the expiration of the last patent involved in the agreement.[11] (Joint Ex. 2, Art. IV.)

After signing the 1991 agreement with Mr. Volkert, Intervisual was "excited" by the prospect of marketing in-line pop-ups, and planned to "aggressively sell them." (R. at 49.) Intervisual moved its office from Chicago to Northbrook, where Mr. Volkert was headquartered, in an effort to give its sales staff an opportunity to learn about machine-made pop-ups from Mr. Volkert. (R. at 54.) Not long after signing the agreement, however, the relationship between Mr. Volkert and Intervisual began to deteriorate. Mr. Volkert was displeased that Intervisual was "selling other products instead of just in-line pop-ups." (R. at 54.)

As a result, Messrs. Richwine and Volkert negotiated, and signed, an amendment to the 1991 agreement on January 24, 1992. (R. at 57.) That amendment waived the previous requirement that Mr. Volkert completely resolve the pending litigation with Ib Penick and Webcraft before Intervisual would exercise its option to add the two patents at issue to the exclusive license agreement. (Joint Ex. 3.) Pursuant to the renegotiated agreement, Intervisual exercised its option to incorporate the two patents into its agreement with Mr. Volkert, and paid a $50,000 advance to Mr. Volkert immediately. (R. at 57.)

Despite over $2,000,000 in sales of his patented pop-ups in 1992, Mr. Volkert continued to be "unhappy with Intervisual." (R. at 58–59.) According to Mr. Richwine, Mr. Volkert complained that Intervisual should be "putting all of [its] efforts ... on selling in-line pop-ups." (R. at 59.) Eventually, Mr. Volkert's dissatisfaction grew to such an extent that he forced Intervisual to leave his office space in Northbrook. (R. at 59.) Again, as a result of Mr. Volkert's displeasure, Messrs.

Volkert and Richwine negotiated another amended agreement on January 20, 1993. (R. at 61.)

The 1993 agreement reduced the number of hours per year that Mr. Volkert was expected to devote to consulting services from 1,380 to 920. (Joint Ex. 1, Art. II.) The $100,000 and $50,000 advances against future royalties paid by Intervisual to Mr. Volkert pursuant to the 1991 and 1992 agreements, respectively, were deemed "non-refundable." (Joint Ex. 1, Art. III.) As a result, Mr. Volkert did not have to count those amounts against sales. (Joint Ex. 1, Art. III.) According to Mr. Richwine, "it was basically giving him another $150,000." (R. at 63.)

Mr. Volkert's royalty schedule was altered such that Intervisual was required to pay him royalties at a rate of 6% on the first $1,000,000 in annual patented pop-up revenue, and 5% for all patented pop-up sales thereafter. (Joint Ex. 1, Art. III.) A provision was added to pay Mr. Volkert a royalty if non-pop-up pieces were sold that he had a role in developing. (Joint Ex. 1, Art. III.) Another provision was added allowing Mr. Volkert to terminate the agreement if Intervisual did not pay him a minimum royalty of $110,000 per year. (Joint Ex. 1, Art. IV.)

Relations between Mr. Volkert and Intervisual remained strained, despite having amended the exclusive license agreement twice. On February 29, 1996, Mr. Volkert delivered a letter to Mr. Richwine, serving notice that he found Intervisual to be in breach of the exclusive license agreement. (Defs.' Answer and Countercl. at 6.) Mr. Volkert alleged, in his letter and subsequent pleadings, that Intervisual had breached the agreement by failing to use its "best efforts" to sell machine-made pop-ups, failing to pay royalties on a monthly basis, failing to provide access to verify invoice amounts, failing to subcontract with him on certain retail

---

11. The last patent included in the exclusive license agreement, No. 4,963,125, entitled "Promotional Pop–Up and Method of Making," was issued October 16, 1990. At that time, the term of a United States patent was seventeen years from the date the patent was issued. 35 U.S.C. § 154(a)(2) (1988). Thus, the exclusive license agreement would presumably terminate automatically no later than October 16, 2007. However, effective June 8, 1995, the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809 (1994), extended the term of a patent from seventeen years to twenty years from the date the patent issued, subject to the payment of the appropriate fees. 35 U.S.C. § 154(a)(2) (West Supp.1995). Accordingly, upon payment of the appropriate fees, the exclusive license agreement could remain in force until October 16, 2010.

sales, failing to mark patented pieces, failing to pay royalties on particular jobs, failing to use him in sales presentations, and failing to deal in good faith where it maintained a minimum purchase contract for hand-made pop-ups with Carvajal, a manufacturer in Mexico.[12] (Joint Ex. 13; R. at 87–105.)

On March 25, 1996, Intervisual's Director of Finance, Bruce Shiney, sent a letter to Mr. Volkert, addressing each of the breaches alleged in the February 29, 1996, letter. (Pl.'s Ex. 102.) On April 2, 1996, Mr. Volkert replied with a letter to Mr. Richwine, officially terminating the exclusive license agreement. (Pl.'s Ex. 103.) Mr. Volkert insisted that the breaches he had alleged were not cured to his reasonable satisfaction, as was required by the exclusive license agreement. (Pl.'s Ex. 103.)

On September 24, 1996, Mr. Volkert, operating under the assumption that the agreement with Intervisual had been officially terminated, negotiated a non-exclusive license agreement between One–Up and The Lehigh Press, Inc., Cadillac Commercial Products Division ("Lehigh Press"). (Pl.1s Ex. 118.) One–Up granted Lehigh Press a non-exclusive license to many of the same patents[13] included in Mr. Volkert's agreement with Intervisual. (Pl.'s Ex. 118.) In exchange, Lehigh Press agreed to pay Mr. Volkert royalties of $45,000. (Pl.'s Ex. 118.) This amount was an advance against future royalties, expected to be earned by Mr. Volkert at a rate of 15% for the first $4 million in annual sales of patented pieces, and 10% for all such sales thereafter. (Pl.'s Ex. 118.)

As a result of Mr. Volkert's attempted termination of the exclusive license agreement, Intervisual was quite reluctant to sell patented pop-ups. According to Mr. Richwine, Intervisual was leery of selling patented pop-ups because its "customers could get into a patent infringement lawsuit, because John Volkert owns the patents." (R. at 108.) As a result, Intervisual sold no

patented pop-ups from April 1, 1996, through May 28, 1997. (R. at 108.) Even so, Intervisual attempted to uphold its end of the exclusive license agreement by placing Mr. Volkert's minimum annual royalty payment of $110,000 for 1996 "in escrow." (R. at 111–12.)

Intervisual brought this action for a declaratory judgment that it did not breach its exclusive license agreement with Mr. Volkert, and that the agreement, therefore, remains in full force and effect. Further, Intervisual maintains that Mr. Volkert has tortiously interfered with its prospective economic advantage, and seeks damages for lost sales, as well as an injunction to prevent future interference. Mr. Volkert counterclaims for a declaratory judgment that Intervisual has breached the exclusive license agreement and that his termination of the agreement was rightful. Mr. Volkert also counterclaims for lost royalties and for an injunction against Intervisual's further use of his patents. Both parties plead for any additional relief the Court may deem fair and just.

## *ANALYSIS*

### I. *Legal Standard for Entry of Judgment Under Declaratory Judgment Act*

██ The Declaratory Judgment Act, 28 U.S.C. § 2201(a) allows "any court of the United States, upon the filing of an appropriate pleading," to "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Any plea for declaratory judgment must satisfy the case or controversy requirement of Article III of the United States Constitution. *In re: VMS Sec. Litig.*, 103 F.3d 1317, 1327 (7th Cir. 1996). Federal courts have discretion regarding whether to hear a declaratory judgment matter, even when jurisdictional requirements have been met. *Id.* However,

12. Between 1991 and 1993, Intervisual maintained an agreement with Carvajal requiring Intervisual to purchase $12,500 of hand-made pop-ups per month from Carvajal.

13. The agreement between One–Up and Lehigh Press includes all of the patents listed in the agreement with Intervisual, except United States Letters Patents No. 3,995,388, issued December 7, 1976, entitled "Pop–Up Products and Method of Making"; and No. 4,146,983, issued April 3, 1979, entitled "Promotional Pop–Up and Method."

the Declaratory Judgment Act should be construed to effectuate the purpose of the Act, which is "to afford relief from uncertainty and insecurity with respect to legal relations." *Imperial Cas. and Indem. Co. v. Chicago Hous. Auth.*, 759 F.Supp. 446, 448 (N.D.Ill.1991) (quoting *Sears, Roebuck and Co. v. American Mut. Liab. Ins. Co.*, 372 F.2d 435, 438 (7th Cir.1967)). Thus, if the declaratory judgment will clarify and settle the legal relations at issue and afford parties relief from insecurity and uncertainty, the declaratory judgment action is usually heard. *Nucor Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 578 (7th Cir.1994).

■ In the instant case, it is clearly proper for this Court to render a judgment under the Declaratory Judgment Act. That there exists a case or controversy that satisfies the requirement of Article III of the Constitution is evidenced by the fact that injury and damages are claimed by both Intervisual and Mr. Volkert. Further, a ruling by this Court will serve to clarify the rights and obligations of all parties under the exclusive license agreement. Having determined that the Court may properly hear this case under the Declaratory Judgment Act, the Court turns to the gravamen of this action, which is whether Intervisual breached its contract with Mr. Volkert, as Mr. Volkert has alleged.

### A. Legal Standard for Breach of Contract

■ For Intervisual to succeed in this declaratory judgment action, it must prove that it has not breached the exclusive license agreement with Mr. Volkert, and that, therefore, Mr. Volkert's allegations of breach of contract are without merit. For Mr. Volkert to prove a prima facie breach of contract claim, he would have to show that: 1) a valid contract with definite and certain terms exists between him and Intervisual; 2) he has performed his obligations under the contract; 3) Intervisual has failed to perform its con-

tractual duties; and 4) he has suffered damages as a result of Intervisual's breach. *See Hoopla Sports and Entertainment, Inc. v. Nike, Inc.*, 947 F.Supp. 347, 356 (N.D.Ill. 1996).

The first element of a breach of contract claim, the existence of a valid contract, is not in dispute here. Both parties agree, at the very least, that the exclusive license agreement was in force and effect from October 21, 1991, through February 29, 1996. Hence, Intervisual cannot disprove Mr. Volkert's allegation of breach of contract by claiming that a valid contract did not exist.

The second element of a breach of contract claim, the requirement that Mr. Volkert perform his obligations under the contract, is very much in dispute. *Hoopla Sports*, 947 F.Supp. at 356. Intervisual maintains that Mr. Volkert has improperly terminated the exclusive license agreement. In so doing, Intervisual implicitly argues that Mr. Volkert cannot satisfy this second element of a breach of contract action and that, therefore, Mr. Volkert's breach of contract claim must fail. However, proof that Mr. Volkert has improperly terminated the exclusive license agreement and, therefore, has not performed his obligations under the contract, is dependent on the third element of a breach of contract—whether Intervisual has breached the exclusive license agreement.

Hence, the success or failure of Intervisual's plea for declaratory judgment turns on the third element of the breach of contract formula. To satisfy the third element necessary to maintain a breach of contract action, Mr. Volkert must show that Intervisual has failed to perform its contractual duties. Thus, if Intervisual can prove that it has not breached its contractual duties, Mr. Volkert's allegations of breach of contract must fail, and Intervisual will be granted declaratory judgment.[14]

■ To prove that it has performed its contractual duties, Intervisual must repudiate the breaches alleged by Mr. Volkert in

---

14. Because Intervisual successfully proves that it has not breached its contractual duties, the third element necessary for Mr. Volkert to maintain a breach of contract claim fails. Accordingly, analysis of the fourth element of a breach of

contract claim—that Mr. Volkert has suffered damages as a result of Intervisual's breach—is unnecessary. *See Hoopla Sports,* 947 F.Supp. at 356.

his termination letter of February 29, 1996, according to Illinois' standard for determining a contractual "breach." It is well-settled that only a material breach will justify the non-breaching party's failure to perform its contractual duties. *Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 714 (7th Cir.1993). A minor, non-material breach will not preclude specific performance. *Id.* The *Arrow Master* court considered a breach to be "material" when "the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it." *Id.* at 715 (quoting *Haisma v. Edgar*, 218 Ill.App.3d 78, 161 Ill.Dec. 36, 578 N.E.2d 163 (1991)). With these standards in mind, the Court next examines each of the breaches alleged by Mr. Volkert in his termination letter of February 29, 1996.

### B. Intervisual's Alleged Contractual Breaches

#### 1. *Failure to Use "Best Efforts" to Market Patented Pop–Ups*

██ Mr. Volkert argues that Intervisual failed to use its "best efforts" to market his patented pop-ups, even though there is no express term in the exclusive license agreement requiring Intervisual to use its "best efforts" to market Mr. Volkert's pop-ups. (Joint Ex. 1.) By failing to use its "best efforts," Mr. Volkert argues, Intervisual has breached the exclusive license agreement. However, a party is not required to use its "best efforts" where an explicit "best efforts" term is absent from the contract, and consideration, in the form of substantial advance royalties, already exists to satisfy the mutuality requirement of the otherwise valid contract. *Dan Beraha, M.D. v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992).

In *Beraha*, a case relied upon by both parties, the plaintiff/licensor of a patent for a biopsy needle, urged the court to find an implied "best efforts" clause in its license agreement with the defendant/licensee. *Id.* The *Beraha* court, however, declined to find such an implied "best efforts" clause because the licensor was receiving substantial advance royalties. *Id.* Such advance royalties provided a sufficient incentive for the licensee to aggressively market the licensed patent. The advance royalties also provided the licensor a degree of security, in the event that the patent proved to be unmarketable.

██ *Beraha* is instructive in the instant case. Here, Mr. Volkert argues that Intervisual failed to use its best efforts, and in so doing, breached the exclusive license agreement. However, the exclusive license agreement does not include an express "best efforts" clause. Following the rationale of *Beraha*, because Mr. Volkert negotiated for substantial advance royalties, and failed to include an express "best efforts" provision, a "best efforts" provision cannot be implied.[15] Accordingly, Mr. Volkert's first alleged breach of the exclusive license contract, that Intervisual failed to use its "best efforts" to market patented pop-ups, is rejected.[16]

#### 2. *Failure to Pay Royalties on a Monthly Basis*

Mr. Volkert next argues that Intervisual breached the exclusive license agreement by failing to pay royalties on a monthly basis, as is required by the contract. (Joint Ex. 1.) Intervisual, though, did not receive payments every month for jobs that involved Mr. Volkert's products. According to Mr. Shiney, Intervisual usually paid Mr. Volkert within thirty days after receiving payment for a job in which he was involved. (R. at 210.) Intervisual argues that, by accepting all payments that he now complains of as being late,

---

**15.** Even if, *arguendo*, this Court did imply a "best efforts" clause, it is not clear that such a clause would be enforceable. Illinois courts have found language requiring a party to use its "best efforts" to sell a product too vague to be enforceable. *Kraftco Corp. v. Kolbus*, 1 Ill.App.3d 635, 274 N.E.2d 153, 156 (1971). As explained in *Beraha*, even if a licensee's statement that it would "do [its] very best to make this project a success" was included in the contract between

licensor and licensee, such a statement merely represents an expression of goodwill, rather than an enforceable promise. *Beraha*, 956 F.2d at 1440.

**16.** Mr. Volkert counterclaims for a declaration that Intervisual failed to use its "best efforts" to market patented pop-ups. Pursuant to the foregoing analysis, said counterclaim is rejected.

Mr. Volkert has impliedly waived his right to assert late payment as a breach of contract. There is ample authority for this view.

■■■■ Waiver is the intentional relinquishment of a right. *Cole Taylor Bank v. Truck Ins. Exch.*, 51 F.3d 736, 739 (7th Cir. 1995). A waiver of contractual rights may be express, or it may be implied by words or actions inconsistent with the assertion of those rights. *Id.* In Illinois, waiver requires a showing of induced reliance, or it must be clearly inferable from the circumstances. *Id.* Regular acceptance of late payments has been held to serve as an implied waiver to a claim of breach of contract for late payments. *Lang v. Parks*, 19 Ill.2d 223, 226, 166 N.E.2d 10 (1960). A party is barred from making a claim for breach in such situation until he or she has given the tendering party reasonable notice that late payment will no longer be accepted. *Id.*

■■■ In *Lang*, a vendor who regularly accepted late payments for a period of four years, despite a "time is of the essence" provision in a contract of sale, was required to give reasonable notice to the vendee before tardy payments could legally be considered grounds for a breach of contract claim. *Id.* Here, Mr. Volkert accepted all royalty payments made to him by Intervisual. Even if he complained of their lateness, Mr. Volkert never put Intervisual on notice that late payments would be considered a breach of contract. (R. at 276.) Mr. Volkert's conduct impliedly waives his right to assert late payments as a breach of contract. Further, Mr. Volkert's ownership of several patents, and his years of experience in the business world, militate against a finding that he was unaware that he was waiving his right by accepting late payments.[17] (R. at 216.) According to the foregoing analysis, Mr. Volkert's second alleged breach fails.

### 3. *Failure to Provide Access to Verify Invoice Amounts*

■■■ Mr. Volkert also argues that Intervisual breached the exclusive license agreement by failing to allow him access to its financial books, in order to verify invoices involving his patents. However, both the 1991 and the 1993 version of the exclusive license agreement contain an explicit provision giving Mr. Volkert's accountant access to Intervisual's financial books, upon Mr. Volkert's request. Mr. Volkert has never requested that his accountant be given access to Intervisual's books. (R. at 93.) Because Mr. Volkert did not use the proper procedure to inspect Intervisual's books, Intervisual has not breached by failing to allow Mr. Volkert access to its financial records. Therefore, Mr. Volkert's third alleged breach is rejected.

### 4. *Failure to Subcontract with Mr. Volkert to Produce Pop–Ups for Retail Sale*

Mr. Volkert alleges that Intervisual produced the "Silly Time Songs Pop-up Book" for retail sale, but refused to subcontract with him for work on the book. However, Mr. Richwine testified that Intervisual had "nothing whatsoever" to do with the production of the children's book. (R. at 94, Amended Final Pretrial Order, Exhibit A, Stipulation of Uncontested Facts at § 12.) Instead, Techweb, a subsidiary of Donnelly, was responsible for producing the book. (R. at 94.) On cross-examination, Mr. Volkert admitted that he had no evidence that Intervisual had anything to do with the production of the "Silly Time Songs Pop-up Book." (R. at 321.) Having put forth no evidence whatsoever to support the vague implication that, because both Techweb and Intervisual are affiliated with Donnelly, Intervisual is somehow responsible for producing the "Silly Time Songs Pop-up Book," Mr. Volkert's fourth alleged breach of the exclusive license contract fails.

### 5. *Failure to Mark Mr. Volkert's Patent Numbers on Patented Pop–Ups Produced by Intervisual*

■■■ Mr. Volkert alleges that Intervisual breached the exclusive license agreement by

---

17. Moreover, even if this Court, arguendo, were to hold that Mr. Volkert did not waive his right to claim late payment as a breach, the tardiness alleged here does not constitute a material "breach" of the exclusive license agreement. *Arrow Master*, 12 F.3d at 715. Following the *Arrow Master* test for materiality of a contract breach, it is highly unlikely that this exclusive patent license agreement would have turned on the condition that all royalty payments be made within thirty days. 12 F.3d at 715.

failing to mark his patent numbers on patented pop-ups it produced. Specifically, Mr. Volkert charges Intervisual with responsibility for failing to properly mark the "Devon Direct/Primestar," "American Tobacco," and "Camel" jobs. (Pl.'s Ex. 102.) However, neither the "Devon Direct/Primestar" nor the "American Tobacco" jobs were produced by Intervisual. (R. at 97, Amended Final Pretrial Order, Exhibit A, Stipulation of Uncontested Facts, at §§ 15–16.) Mr. Richwine admitted that Intervisual made a "mistake" by failing to put the proper patent mark on the "Camel" job. (R. at 99.) Mr. Richwine confirmed that this was the only job where Intervisual omitted Mr. Volkert's patent mark. (R. at 99.)

It is clear that Intervisual should have included Mr. Volkert's patent mark on the "Camel" job. However, Intervisual's omission is not a "material" breach, when examined under the *Arrow Master* test for materiality. 12 F.3d at 715. The "Camel" job was one of many jobs in which Mr. Volkert's patents were involved. The single incident of inadvertent omission does not rise to the level of a material breach of contract, and therefore, Mr. Volkert's fifth alleged breach is rejected.

### 6. *Failure to Pay Royalties on Certain Jobs*

Mr. Volkert alleges that Intervisual breached the exclusive license agreement by failing to pay him royalties for the "Discover," "Nokia," and "Blue Cross/Blue Shield" jobs. In support of this contention, Mr. Volkert offered some paperwork from Webcraft purporting to show that Intervisual received royalty payments for these jobs. (R. at 100.) However, Mr. Richwine testified that Intervisual had nothing to do with these jobs, and received no monies for any of them. (R. at 100–01.) While there is some confusion regarding royalty payments on these jobs, the Court is satisfied that, based on Mr. Richwine's credible testimony, Intervisual re-

ceived no monies related to Mr. Volkert's patents for the aforementioned jobs. As a result, Mr. Volkert's sixth alleged breach of the exclusive license agreement fails.[18]

### 7. *Failure to Use Mr. Volkert in Sales Presentations, and Intervisual's Alleged Lack of Incentive to Sell Machine-made Pop–Ups Due to its Contractual Arrangement with Carvajal*

 Mr. Volkert alleges that Intervisual's failure to utilize his expertise during sales presentations constitutes a breach of the exclusive license agreement. However, a reading of the plain language of the agreement reveals that Intervisual is not required to use Mr. Volkert for sales presentations. (Joint Ex. 1.) Rather, Intervisual has the discretion to determine whether or not to use Mr. Volkert for sales presentations. (Joint Ex. 1.) Accordingly, Intervisual has not breached this discretionary provision of the agreement.

 Mr. Volkert further alleges that Intervisual has dealt with him in bad faith by maintaining a minimum purchase contract for hand-made pop-ups with Carvajal, a manufacturer in Mexico.[19] Although Intervisual had a minimum purchase contract with Carvajal, from 1991 through 1993, Intervisual typically invoiced four or five times the required minimum level of sales with Carvajal. (R. at 103–04.) As Mr. Richwine testified, "I don't think [Intervisual] had ever done less than ... $800,000 ... [in yearly business] ... with Carvajal." (R. at 104.) Hence, for all practical purposes, the contractually-required minimum invoice of $12,500 per month was superfluous. Recognizing this, Intervisual and Carvajal eliminated the minimum purchase requirement provision from their business relationship in 1993. (R. at 103–04.) Mr. Volkert's argument, that Intervisual's contractual relationship with Carvajal impacted Intervisual's willingness to sell Mr.

---

**18.** Mr. Volkert counterclaims that he did not receive the advance royalty payment of $50,000 that Intervisual was to pay him under the 1991 exclusive license agreement. (Defs.' Answer and Countercl. at 14.) However, the 1993 exclusive license agreement expressly provided that Mr. Volkert had received the $50,000 advance royalty payment. (Joint Ex. 1, Art. III, § 1.) Thus, Mr.

Volkert's signature on the 1993 agreement effectively defeats this counterclaim.

**19.** The contract required that Intervisual purchase $12,500 worth of hand-made pop-ups per month from Carvajal. (R. at 104.)

Volkert's patented machine-made pop-ups, is unpersuasive.[20] Accordingly, Mr. Volkert's seventh alleged breach of the exclusive license agreement is rejected.

## C. Intervisual has Committed No Material Breaches

Based on all of the testimony during the trial, as well as close scrutiny of the Record, the Court finds that all of the breaches of the exclusive license agreement alleged by Mr. Volkert have been satisfactorily rebutted. Therefore, the Court finds that: Intervisual has not breached its exclusive license agreement with Mr. Volkert; Mr. Volkert's attempted termination of the agreement was wrongful; and the exclusive license agreement remains in full force and effect. The Court will next consider Intervisual's claim that Mr. Volkert tortiously interfered with its prospective economic advantage.

## II. *Legal Standard for Tortious Interference with Prospective Economic Advantage*

■■■ To prove a prima facie case of tortious interference with prospective economic advantage, a plaintiff must show: 1) the plaintiff's reasonable expectation of entering into a valid business relationship; 2) the defendant's knowledge of the plaintiff's expectancy; 3) purposeful interference by the defendant that causes the plaintiff's expectations to remain unfulfilled; and 4) that the defendant's interference has resulted in damages to the plaintiff. *Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 170–171 (7th Cir.1993). The first element of a claim for tortious interference with prospective economic advantage, the existence of a "reasonable expectation" of entering into a valid business relationship, requires the plaintiff to specifically identify third parties who "actually contemplated entering into a business re-

lationship with [him]." *Celex Group, Inc. v. The Executive Gallery*, 877 F.Supp. 1114, 1126 n. 19 (N.D.Ill.1995) Simply offering proof of a past customer relationship is not sufficient to prove a "reasonable expectation" of a future business relationship. *Id.* at 1124. If a plaintiff were not required to specifically identify parties who actually contemplated entering into a business relationship with him, "liability under a theory of tortious interference with prospective business expectancies would be virtually without limit and impossible to calculate." *Id.* at 1125–26 n. 19.

■■■ Here, Intervisual alleges that Mr. Volkert has tortiously interfered with Intervisual's prospective economic advantage by telling its potential customers that the agreement between Mr. Volkert and Intervisual no longer existed, and that Mr. Volkert would soon be licensing his patents to new entities. (Compl. at 7.) In support of its allegations, however, Intervisual fails to specifically identify any particular third party with whom Mr. Volkert interfered. Intervisual merely offers proof of past customer relationships by demonstrating that its annual in-line pop-up sales averaged $1,800,000 between 1992 and 1995. (R. at 109.) However, such figures are insufficient to prove a "reasonable expectation" of entering into a valid business relationship. *Celex*, 877 F.Supp. at 1125. In light of Intervisual's failure to prove the first element necessary to make out a prima facie case for interference with prospective economic advantage, analysis of the remaining three elements is unnecessary. Intervisual's claim for tortious interference with prospective economic advantage fails.

## III. *Intervisual's Prayer for Permanent Injunctive Relief*

Intervisual next seeks to permanently enjoin Mr. Volkert from: contacting Intervisu-

---

**20.** Mr. Volkert counterclaims that Intervisual's failure to inform him of its contract with Carvajal to produce hand-made pop-ups constitutes fraudulent inducement to contract. However, Mr. Volkert admits that he knew "that a predecessor ... of Intervisual had arrangements with ... Mexican companies to manufacture ... handmade pop-ups." (Defs.' Answer and Countercl. at 10.) Mr. Volkert claims that he was not aware that Intervisual "had to guarantee a cer-

tain level of patronage" to "obtain preferential treatment" from "out-of country suppliers." (Defs.' Answer and Countercl. at 10.) Pursuant to the foregoing analysis, however, the Court finds that Intervisual's minimum invoice requirement with Carvajal cannot support a claim for fraudulent inducement to contract. Accordingly, Mr. Volkert's counterclaim for fraudulent inducement to contract fails.

al's current or prospective customers for the purpose of alleging that Intervisual breached the exclusive license agreement; licensing Intervisual's exclusive patent rights to third parties; and soliciting customers to sell pop-ups for the life of the exclusive license agreement. (Compl. at 8.)

For a permanent injunction to issue from the court, Intervisual must prevail on the merits of its claim and establish that equitable relief is appropriate. *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506–07, 79 S.Ct. 948, 954–55, 3 L.E.2d 988 (1959). In the Seventh Circuit, "[a] party seeking a permanent injunction must establish that (1) he has succeeded on the merits, (2) no adequate remedy at law exists,[21] (3) irreparable harm will arise absent injunctive relief, (4) the balance of harms favors entry of an injunction, and (5) the entry of the injunction will not harm the public interest." *Nicholas Knapp v. Northwestern University,* 942 F.Supp. 1191, 1194 (N.D.Ill.1996), *rev'd on other grounds,* 101 F.3d 473 (7th Cir.1996); *Smith Barney, Harris, Upham & Co., Inc. v. St. Pierre,* 1994 WL 11600 *3 (N.D.Ill.1994).

### A. Intervisual's Success on the Merits

The first element necessary for a permanent injunction to issue, success on the merits, has been satisfied by the Court's finding that Intervisual did not breach the exclusive license agreement, and that said exclusive license agreement remains in full force and effect. Implicitly, the Court's judgment prohibits Mr. Volkert from contacting Intervisual's prospective customers for the purpose of alleging that Intervisual breached the exclusive license agreement, to sell pop-ups, or to license the patent rights included in the exclusive license agreement. As Intervisual has fulfilled the first requirement for a permanent injunction—success on the merits—the Court next considers the second element necessary for a permanent injunction to issue: that there is no adequate remedy at law.

### B. No Adequate Remedy at Law

In order for an injunction to issue, Intervisual must show that no adequate remedy at law exists. "When . . . the issue is whether to grant a permanent injunction, . . . the burden is to show that damages are inadequate" for a particular situation. *Walgreen Co. v. Sara Creek Property Co.,* 966 F.2d 273, 275 (7th Cir.1992). Determination of the adequacy of damages as opposed to injunctive relief requires a balancing of the costs and benefits of the alternatives. *Id.*

Here, an analysis of the costs and benefits of enjoining Mr. Volkert from contacting Intervisual's prospective customers to allege that Intervisual breached the exclusive license agreement, to sell pop-ups, or to license the patent rights contained in the exclusive license agreement, weighs against issuing any injunctive relief. By entering a declaratory judgment that the exclusive license agreement is in full force and effect, the Court is implicitly requiring Mr. Volkert to refrain from the very conduct for which Intervisual is seeking a permanent injunction. Indeed, the exclusive license agreement includes express terms prohibiting Mr. Volkert from licensing the patents at issue to third parties, and from becoming "engaged in the sale or manufacture" of patented pop-ups. (Joint Ex. 1, Art. I, § 2, Art. V, §§ 3–4.)

To, in addition, specifically enjoin Mr. Volkert from activities that are already implicitly "prohibited" by the exclusive license agreement would be unnecessarily cumulative. The costs of issuing and enforcing an injunction outweigh the marginal benefit to Intervisual of having an injunction issue against Mr. Volkert. Any violation of the injunction being sought by Intervisual could be properly brought in a breach of contract action. In short, there is a sufficient remedy at law to warrant a finding that the issuance of an injunction against Mr. Volkert is unnecessary. Thus, the second element necessary for a permanent injunction to issue is not satisfied, thereby foreclosing analysis of the third and fourth elements necessary for a

---

**21.** Lack of an adequate remedy at law ordinarily means that money damages would not suffice. *American Medicorp, Inc. v. Continental Illinois* *Nat'l Bank and Trust Co. of Chicago,* 475 F.Supp. 5, 7 (N.D.Ill.1977).

permanent injunction to issue. Accordingly, Intervisual's prayer for injunctive relief is denied.

### IV. *Mr. Volkert's Counterclaims*

Most of Mr. Volkert's counterclaims have been disposed of, as they turn on the same factual disputes as Intervisual's successful action for declaratory judgment. Nonetheless, they will be addressed briefly. Mr. Volkert's first counterclaim alleges a host of breaches of the exclusive license agreement, including: fraudulent inducement to contract; failure to use "best efforts" to market patented pop-ups; failure to exercise reasonable supervision over third-party licensee Webcraft; failure to include patented pop-ups in proposals to potential customers; proposing patented pop-ups to customers at artificially high prices; and failure to pay royalties.[22] (Defs.' Answer and Countercl. at 12–14.) Mr. Volkert's second counterclaim alleges patent infringement.[23] (Defs.' Answer and Countercl. at 15.) Further, Mr. Volkert seeks a declaration that Intervisual breached the exclusive license agreement, damages for lost royalties, termination of the exclusive license agreement, and an injunction against further patent infringement.

### A. Mr. Volkert's First Counterclaim

Mr. Volkert alleges that Intervisual's failure to exercise reasonable supervision over a third party sub-licensee constitutes a breach of the exclusive license agreement. However, a reading of the plain language of the text of the agreement reveals that the agreement contains no such provision requiring Intervisual to supervise third party sub-licensees.[24] The Court finds that this alleged failure does not constitute a breach of the exclusive license agreement.

Mr. Volkert further alleges that Intervisual failed to include machine-made pop-ups in "proposals to potential customers such as Procter & Gamble," and that Intervisual submitted inflated prices for "pop-ups made under Patent Rights to cause ... customers to choose hand made products over pop-ups made under Patent Rights." (Defs.' Answer and Countercl. at 14.) These actions, Mr. Volkert asserts, constitute breaches of the exclusive license agreement. However, Mr. Volkert produced no evidence to substantiate either charge, and the alleged breaches of the exclusive license agreement are, therefore, repudiated. Accordingly, Mr. Volkert's first counterclaim is denied.

### B. Mr. Volkert's Second Counterclaim

Mr. Volkert next alleges, in his second counterclaim, that Intervisual has infringed on his patents. (Defs.' Answer and Countercl. at 14–15.) However, Mr. Volkert's second counterclaim must necessarily fail as a result of the Court's determination that the exclusive license agreement between Intervisual and Mr. Volkert is still in full force and effect. By finding that Intervisual has an exclusive right to use Mr. Volkert's patents, there can be no action for patent infringement regarding those patents, and thus, Mr. Volkert's second counterclaim is denied.[25]

### V. *Damages & Attorney's Fees*

### A. Intervisual's Prayer for Compensatory Damages

Although Intervisual did not prove tortious interference with prospective economic ad-

---

22. Mr. Volkert's claims that Intervisual fraudulently induced him to enter the exclusive license agreement, failed to use its "best efforts" to market his patented pop-ups, and failed to pay all the royalties it owes him are addressed by the Court's analysis of Intervisual's successful declaratory judgment action. *See supra* at 1100–1101, 1102–1103.

23. Mr. Volkert waived his third counterclaim, which alleges unfair competition based on patent infringement, after Intervisual assured him that no machine-made pop-ups were sold by Intervisual during 1996. (Amended Final Pretrial Order at 2(h).)

24. Mr. Volkert also admitted this point on cross-examination. (R. at 328.)

25. Although Mr. Volkert further seeks compensatory damages, a declaration terminating the exclusive license agreement and injunctive relief against future patent infringement, he was ultimately unable to prove that Intervisual breached the exclusive license agreement. (Defs.' Answer and Countercl. at 15–16.) Therefore, Mr. Volkert's prayer for damages, and declaratory and injunctive relief must fail.

vantage to the satisfaction of the Court, it is clear that Intervisual's sales of machine-made pop-ups, over the past year, have been damaged by Mr. Volkert's wrongful termination of the exclusive license agreement. The Declaratory Judgment Act allows "further necessary or proper relief based on a declaratory judgment ... after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202 (1994); *see also Illinois Physicians Union v. Miller,* 675 F.2d 151 (7th Cir.1982). In the interest of equity, the Court deems a monetary award to Intervisual to be necessary and proper relief.

Damages for a breach of contract are based on the mutual expectations of the parties. *Roboserve, Inc. v. Kato Kagaku Co., Ltd.,* 78 F.3d 266, 278 (7th Cir.1996), *cert. denied* —— U.S. ——, 117 S.Ct. 297, 136 L.Ed.2d 215 (1996). The basic measure of contract damages is that the injured party is entitled to the "benefit of the bargain," a position as good as he or she would have enjoyed had the contract terms been executed. *Id.* However, the plaintiff is not entitled to a windfall. *Id.*

The amount to be awarded to Intervisual is the amount Intervisual would have profited, had Mr. Volkert upheld his end of the exclusive license agreement. Intervisual's average annual sales of patented pop-ups from 1992 through 1995 was approximately $1,800,000. (R. at 109.) According to Mr. Richwine, Intervisual earned a gross profit of 31%, before royalty payments, on the sale of patented pop-ups. (R. at 35.) Thus, Intervisual realized average yearly profits on patented pop-ups of approximately $558,000 from 1992 through 1995. Broken down monthly, Intervisual earned an average of approximately $46,500 in profits on the sale of patented pop-ups per month between 1992 and 1995. Intervisual is seeking damages for lost profits from April 1, 1996 through May 28, 1997. Over this 14–month period, Intervisual would most likely have made a profit of $651,000, if not for this contract dispute.

In Illinois, "lost profits are calculated by subtracting from revenue lost as a result of a breach those costs avoided as a result of the same breach." *Durasys, Inc. v. Leyba,* 992 F.2d 1465, 1469 (7th Cir.1993). For the fourteen month period for which Intervisual seeks damages for lost profits, Intervisual did not pay Mr. Volkert his annual royalties. Rather, Intervisual deposited Mr. Volkert's minimum annual royalty payment for the 1996 calendar year, a total of $110,000, into an escrow account. (R. at 111.) The exclusive license agreement guarantees Mr. Volkert annual royalties of $110,-000. (Joint Ex. 1, Art. IV, § 2.) Over the 14–month period for which Intervisual seeks damages, Intervisual would have been required to pay Mr. Volkert royalties of $128,-333.[26]

Accordingly, Intervisual's damage award must be offset by the royalties that would have been due Mr. Volkert. As Intervisual would have realized a profit during this period of $651,000, and would have had to pay Mr. Volkert a total of $128,333, Intervisual is entitled to lost profits of $522,667. This amount includes Mr. Volkert's $110,000 royalty payment that Intervisual has escrowed, and shall keep.

In addition, One–Up shall pay Intervisual the $45,000 that it collected from Lehigh Press in their non-exclusive license agreement in September of 1996. (R. at 110.) As the patents involved in the agreement between One–Up and Lehigh Press were still covered by Mr. Volkert's exclusive license agreement with Intervisual, Intervisual has a right to these revenues.

In total, therefore, Intervisual shall receive damages from Defendants in the amount of $567,667. Forty-five thousand dollars of this amount shall be paid by One–Up. The remaining $522,667 shall be paid by either Mr. Volkert, individually, by One–Up, or by Mr. Volkert and One–Up, jointly. Because Mr. Volkert entered the exclusive license agreement with Intervisual both indi-

---

**26.** This amount is equal to the minimum annual guaranteed royalty payment of $110,000 plus $18,333 for the two additional months.

vidually, and as the President of One–Up, both he and One–Up are jointly liable for the entire amount resulting from the breach. Under Illinois law, all joint contractual obligations are joint and several obligations. *Codest Eng'g v. Hyatt Int'l Corp.*, No. 94 C 7335, 1995 WL 683505, at *8 n. 5 (N.D.Ill. Nov.15, 1995). "All parties to a joint obligation ... may be sued jointly, or separate actions may be brought against one or more of them." 735 ILL.COMP.STAT. 5/2–410. Thus, Mr. Volkert and One–Up are jointly and severally liable for Intervisual's compensatory damages.

Intervisual has also asked the Court for attorney's fees and costs in this action. However, an award of attorney's fees is not specifically contemplated under the Declaratory Judgment Act. 28 U.S.C. § 2202 (1994). Case law conflicts as to whether attorney's fees may be awarded as "necessary and proper relief based on a declaratory judgment...." 28 U.S.C. § 2202 (1994). *See Mercantile Nat'l Bank at Dallas v. Bradford Trust Co.*, 850 F.2d 215, (5th Cir.1988) (prevailing party in declaratory judgment action is entitled to award of attorney's fees only where such fees are recoverable "under nondeclaratory judgment circumstances."); *see also GNB Inc. v. Gould, Inc.*, No. 90 C 2413, 1996 WL 18898, at *2 (N.D.Ill. Jan.18, 1996) (court has power to enforce its declaratory judgment, including awarding attorney's fees, in a breach of contract action); *but see Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Structural Sys. Tech., Inc.*, 764 F.Supp. 145, 146 (E.D.Mo.1991), aff'd, 964 F.2d 759, (8th Cir.1992) (although the Declaratory Judgment Act permits "further necessary or proper relief based on declaratory judgment, this language is not statutory authority for recovery of attorney fees); *Spitz v. Tepfer*, No. 96 C 5844, 1997 WL 391996, at *7 (N.D.Ill. July 8, 1997) (request for attorney's fees denied because Declaratory Judgment Act "does not specifically allow for a shift of attorney's fees.").

 Moreover, even if the Court were to hold that attorney's fees could be awarded pursuant to the Declaratory Judgment Act, Intervisual would still have to meet the standard for awarding attorney's fees under Illi-

nois law. *See Mercantile Nat'l Bank at Dallas*, 850 F.2d at 216. In Illinois, attorney's fees are not recoverable by a prevailing party absent statutory authorization. *Miller v. Pollution Control Bd.*, 267 Ill.App.3d 160, 204 Ill.Dec. 774, 784, 642 N.E.2d 475, 485 (1994). Illinois Supreme Court Rule 137 provides for the assessment of a "reasonable attorney fee" against a party found to have brought any "pleading, motion and other paper ... for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." The Court finds that Mr. Volkert has not brought any pleading, motion or other paper related to this action for any improper purpose. Thus, Intervisual's request for attorney's fees and costs is denied.

### CONCLUSION

For the foregoing reasons, the Court finds the exclusive license agreement of January 20, 1993 to be in full force and effect. Intervisual's claims for interference with prospective economic advantage, and for injunctive relief, are denied. All of Defendants' counterclaims are denied.

**IT IS THEREFORE ORDERED** that Declaratory judgment be, and the same hereby is, entered in favor of Plaintiff, and against Defendants.

**IT IS FURTHER ORDERED** that Mr. Volkert and/or One–Up shall pay Intervisual $522,667 for compensatory damages. Additionally, One–Up shall pay Intervisual $45,000 for compensatory damages.