**CONSTRUCTIVE SERVICES OF SAMOA, INC., Plaintiff**

**v.**

**SILA POASA and TONY'S CONSTRUCTION, Defendant.**

High Court of American Samoa
Trial Division

CA No. 62-00

July 13, 2001

Before KRUSE, Chief Justice, ATIULAGI, Associate Judge, and SAGAPOLUTELE, Associate Judge.

Counsel: For Plaintiff, Paul F. Miller
For Defendant, Katopau T. Ainu'u

## OPINION AND ORDER

Plaintiff Construction Services of Samoa, Inc., ("CSS") filed a complaint praying for a permanent injunction to (1) restrain defendants Sila Poasa ("Poasa") and Tony's Construction from using the assets and equipment of CSS, (2) return all assets and equipment to CSS, and (3) pay costs and attorney's fees. Defendants Poasa and Tony's Construction filed and answer and counterclaim for specific performance of an agreement dated March 29, 2000 ("the agreement"), addressing, among other things, the division of assets and liabilities between CSS and Tony's Construction. Plaintiffs argue that the agreement is void for lack of consideration.

## Findings

The evidence presented in this case consisted of the uncertain, contradictory, and overtly conflicting testimonies of Moru Mane, Sallie Mane, and Sila Poasa along with a profound lack of documentary submissions to clarify or at least mitigate the resultant confusion. From this befuddlement, we look for the facts.

141

## A. The Business of CSS

CSS is a company engaging in the business of construction. Moru and Sallie Mane claim to have founded it in December of 1996. According to their testimony, Moru Mane and his friend Peter Larsen ("Larsen"), a purported engineer who now lives in Hawaii, incorporated CSS in July of 1997. Named on the Articles of Incorporation as original board members are Peter Larsen, Sallie Mane, and Jeanette Sili ("Sili"), daughter of defendant Sila Poasa. Since its incorporation, CSS has failed to conduct itself as corporations are wont to do under the statutory requirements for corporate entities accorded by Title 30 of the American Samoa Code. There was no organizational meeting of incorporators, nor bylaws adopted, nor stock certificates issued. *See* A.S.C.A. §§ 30.0118, 30.0119; *Donald Export Trading Co. v. Toko Groceries Distrib., Inc.*, CA No. 13-77, slip op. at 4 (Trial Div. 1979) (Order Denying Motions For Summary Judgment, entered May 18, 1979). There were no guidelines fixing the number of directors or manner of their election. *See* A.S.C.A. §§ 30.0140 and 30.0141. Further, CSS failed to maintain books of account of business transactions, nor even a "stock book containing all the names of all persons who are stockholders of the corporation, their interests, the amount paid on their shares and all transfers thereof," pursuant to A.S.C.A. § 30.0160. Receipts and records appear to have been left in utter disarray until retroactively recorded and interpreted by accountant Victor Stanley in 1999 for tax purposes. The corporate status of CSS was, in fact, a fiction.

## B. The Involvement of Sila Poasa

Defendant Sila Poasa joined CSS in June of 1998 as general manager of that company, whether by board appointment or simple agreement between the Manes and himself, we cannot determine. Previous to that time, from 1997 until about March of 1998, he worked full-time as a Safety Health Supervisor at Star-Kist cannery. Poasa worked as a general manager for CSS for about six months, between June and January of 1999, when he became "president of the company," a title confirmed by the Manes and Poasa in their testimonies before the court. Again, there is no solid evidence aside from contradictory testimony to confirm whether this ascension occurred by board resolution or by simple agreement. Thereafter, Poasa and Sallie Mane, who calls herself the "secretary-treasurer" of CSS, became dual signatories on annual tax returns and on the two checking accounts held by Bank of Hawaii in the name of CSS. Before that time, Sallie Mane and Jeanette Sili were the two signatories on the accounts. Both Poasa and Sallie Mane drew biweekly salaries from CSS. It is uncertain and contested by both parties the extent to which Larsen and Sili were actually involved in CSS. For example, Poasa claims that his daughter handled administration and

letters for CSS as secretary of the company even while attending school in Hawaii, where she would, incredibly, complete payroll and fax it back. Moru and Sallie Mane, on the other hand, testify that Sili's appointment constituted only nominal deference to their friendship with Poasa, and represent her work as sporadic, inconsistent and noncommittal. What is certain, moreover, is that Sili and Larsen appear to have completely withdrawn from any involvement in CSS by March 2000, if not much earlier. They were not "removed" from their directorships by any formal process, but rather seem to have simply lessened their involvement over time due to geographical circumstance.

By March 2000, the principal decision-making powers of CSS resided in three persons: Moru Mane, who was unpaid and titleless ostensibly so as not to decrease disability payments from the U.S. Marine Corps for back injury; Sallie Mane, secretary and treasurer; and Sila Poasa, president and co-signatory on the CSS bank accounts.

C. Ownership of CSS

Due to the lack of records noted above, no documents exist as to the stock ownership of CSS. Plaintiffs did enter one document, Exhibit 1A, entitled "Initial Capitals to Start C.S.S. Operation," but this does not evidence capitalization despite its misleading title. It is, rather, a retroactively written list of items of uncertain meaning, including "Housing rent collected" and "Mr. Mane Reimbursement for expenses rendered." Unexplained, undated, and insufficiently annotated, we find it to be insufficient proof of capitalization. We have thus only the testimonies of the Manes and Poasa to determine the ownership of CSS. On the one hand, the Manes testify that they initially capitalized CSS with between $20,000 and $55,000 drawn from M.S.M., a sole proprietorship owned by Sallie Mane, Moru Mane's 401K investment, and joint savings. They further claim to have invested an additional $50,000 by December 31, 1998. The Manes claim that Poasa invested only $250 when CSS was first incorporated, and that he contributed about $5,000 thereafter, which has been more or less repaid. On the other hand, in addition to the undisputed initial $250, Poasa claims to have contributed $70,000 between December 10, 1997, and December 31, 1998, which was not repaid. Without further documentation, testimony or other evidence for weighing the accuracy of these assertions, we are unable to render a specific finding of exactly the extent to which the Manes and Poasa share ownership of CSS, beyond the finding that both had something of an ownership interest in CSS through both cash and/or labor contributions.

143

## D. The Fall-Out

It is clear that Poasa and the Manes were close friends who entered into a business relationship that went sour. Accounts differ as to the causes and events leading up to the deterioration of the relationship and the signing of the agreement partitioning the assets and liabilities of CSS, but in any case, by March 29, 2000 all three agreed that Poasa would leave CSS. The Manes and Poasa deeply disagree as to how the agreement dated March 29, 2000, came about. According to the Manes, Poasa was notified by letter and did attend a March 9, 2000 meeting to remove him from the position of president of CSS. They state that Poasa did not agree to his removal, and in his anger, threatened to prevent CSS from obtaining government contracts. Poasa then directed a CSS engineer to prepare an agreement, and stated that he would resign from CSS and start his own company, Tony's Construction.

On or about March 29, 2000, the Manes testify that they met with Poasa at Krystal's Restaurant at the Pago Pago International Airport. Sila allegedly presented the agreement at that time, and begged and cried from 8:30 to 1 p.m. for Moru Mane to sign the agreement. Moru Mane said he steadfastly refused to sign the agreement due to CSS's liability to other vendors, but ultimately caved in due to pressure from Sallie Mane, who told him "to please do this because I didn't want to see us part like that."

Poasa contests this version of events, but his testimony is confusing and inconsistent. At one point, he testified that the "owners" of CSS met on March 9, 2000, and again on March 22, 2000, to "iron out some of the problems we faced during that time frame," but that at neither time was his removal as president discussed or voted upon. At a later point, however, Poasa testified that he and the Manes discussed the break-up of the company on March 9, March 17, April 4, and April 5, 2000.

Poasa also testified that he negotiated the agreement with Moru Mane on March 23, 2000, at which time they agreed that, in order to maintain the friendship, they would split the company in half. He claims to have left a draft of the agreement on Moru Mane's desk for review on March 23, 2000. Poasa explains that the March 29, 2000, date on the agreement was when he "finalized" the agreement for his own signature, which he left on Moru Mane's desk on March 30, 2000. He claims that Moru Mane "dragged" his signing until April 5, 2000, and until the end, "kept changing his mind on how to go about it."

From these warring testimonies, and from the substance of the agreement, undisputedly drawn up by Poasa himself, which explicitly refers to the "departure" of Poasa and the "new" formation of Tony's

Construction, we find that the breakup and separation of Poasa from CSS had been in a process of negotiation since at least March 9, 2000. Given the testimonies before us, and given the face of the agreement, which has handwritten, initialed modifications of the typewritten terms, as well as handwritten, initialed insertions of additional terms, it is certain that discussion occurred as to the specific terms of the agreement, whether for four hours by the Manes' account or twelve days by Poasa's.

### E. The Agreement

The agreement dated March 29, 2000 and uncontrovertedly signed by Moru Mane, Sallie Mane, and Poasa provides for the "division of the assets, liabilities and associated resources of [CSS], between CSS and Tony's Construction, *preceding the departure* from CSS of Sila Poasa to run the newly formed company, Tony's Construction as follows." (emphasis added). The agreement then lists equipment to be distributed between the two companies, and divides responsibilities for two ongoing projects of CSS between the two companies. The agreement designates CSS as responsible for the Poloa Village Road project, and states that the construction of an Amanave water tank for the American Samoa Power Authority ("ASPA") would be "constructed by Tony's Construction under CSS contract" where "all debt incurred for said project and all proceeds derived from this project will be transfer [sic] to Tony's Construction." A later-inserted term, handwritten and initialed, provides that either party can use "any equipment needed to complete" either project "free of charge by either party."
The agreement sets forth certain assets and liabilities to remain with CSS, including "all accounts currently receivable by CSS," office furniture and fittings. As for a shop building belonging to CSS valued by both parties at $50,000 that is built upon the property of Sila Poasa adjacent his personal residence, this was to "remain with Tony's Construction *and will use* [sic] *by CSS until CSS has a suitable building available for them*" (italics indicate handwritten, inserted, initialed terms).

Thus, on its face, the agreement provides for the severance of Poasa from CSS, and lists a division of assets, liabilities and projects between the company of CSS, signed for by Moru Mane, and the company of Tony's Construction, signed for by Poasa.

### F. The Aftermath of the Agreement

Soon after the agreement was signed, complications arose. Tony's Construction continued to build the Amanave water tank project with equipment it claims to have obtained from CSS according to the agreement, but encountered difficulties obtaining at least two pieces of equipment, resulting in delays and additional costs of construction. It

appears that Moru and Sallie Mane at some point failed to recognize the validity of the agreement, and thereafter refused to release the equipment described therein to Tony's Construction, either for the Amanave project or otherwise. Poasa, on his part, seems to have taken records from the CSS office that he refuses to return, and claims to have access to the office as part owner of the company.

Problems also occurred with respect to the bank accounts held by CSS, for which Sallie Mane and Poasa are co-signatories. After the agreement was signed, Sallie Mane was unable to utilize the CSS accounts at the Bank of Hawaii. She testifies that Poasa had put the CSS checking accounts on hold, and instructed the bank to prevent her from opening another account for CSS. Unable to purchase materials to sustain an ongoing project or to do payroll for CSS's workers, Sallie Mane testifies that she unsuccessfully attempted to open two more accounts under CSS with herself and Moru Mane, her husband, as signatories. The Bank of Hawaii, according to Sallie Mane, instructed her to close the new accounts and speak with Poasa. The Manes' complaint, filed in the name of CSS, is largely based on the constriction of their business activity as a result of Poasa's alleged meddling.

Sila Poasa's testimony on this point is flatly self-contradictory. At one point, he stated that he put the CSS accounts on hold on March 31, 2000 because he suspected that Moru Mane was not going to "pay and follow through" with the agreement. At a later point, Poasa claims that the Bank of Hawaii rather than himself "froze" the CSS bank accounts. In another instance, Poasa claims not to have known of his removal as President of CSS until March 31, 2000 when he called the bank to "find out why [his] signature had been removed." On the other hand, Poasa also undisputedly drafted and signed the agreement establishing "departure from CSS of Sila Poasa."

Only two clear facts emerge from this testimony regarding the parties' attempts to effectuate the agreement. First, Sallie Mane could not utilize the CSS bank accounts without the signature of Poasa, either due to his interference or to the Mane's failure to comply with the formal requirements for changing signatories on corporate accounts. Second, Poasa has not yet acknowledged that he has "departed" CSS, and so may tend to conduct himself as a representative of that company.

### Discussion

A. Permanent Injunction

■ CSS requests a permanent injunction against Poasa and Tony's Construction from using its assets and equipment, and to return all of its

assets and equipment. A.S.C.A. § 43.1302 allows this Court to issue a permanent injunction only after "full and final trial on the merits", and "determination that a judgment for money damages will inadequately remedy the complained of [sic] wrong." A party requesting injunctive relief must thus show that it would succeed on the merits of the case, and that money damages are an inadequate remedy. *See, e.g., Thompson v. Toluao*, 24 A.S.R. 2d 127, 132 (Land & Titles Div. 1993); *Intervisual Commc'n Inc. v. Volbert*, 975 F. Supp. 1092, 1104 (N.D. Ill. 1997).

## 1. Success on the Merits

To claim the assets and equipment at issue, CSS must first prove to the court that it is the true owner of the assets and equipment currently held and used by Tony's Construction. This, in turn, depends on the validity of the agreement providing for the division of CSS and the transfer of those items to Tony's Construction.

## (a) DISSOLUTION OF PARTNERSHIP

■ That the Manes and Poasa shared a personal and business relationship, managerial authority, and some ownership over CSS is certain. That CSS substantially failed to operate as a corporation is also certain. We now look to circumstantial evidence, and find it appropriate to consider CSS as a partnership for the purpose of interpreting the dissolution agreement. *See Johnson v. Coulter*, 28 A.S.R. 218, 219 (Trial Div. 1995) (when there is no written partnership agreement between the parties the court may look to circumstantial evidence to determine the presence or absence of a partnership).

■ We look to the definition of partnership offered by traditional common law, as well as by the Uniform Partnership Act, which has been adopted by all states except Louisiana, and has not yet been adopted by this Territory. The common law definition widely used is "a contract of two or more competent persons to place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business, and to divide the profit and bear the loss in certain proportions." BLACK'S LAW DICTIONARY 1120 (6th ed. 1990); *see also* 59A AM. JUR. 2d, *Partnership* § 3. Although obviously the Manes and Poasa did not execute a partnership contract, but attempted to formalize CSS as an empty corporation with the intention of avoiding liability, their conduct in placing their money together for profit, and in probably withdrawing those profits without benefit to the corporation, makes them seem to this Court more a partnership than a corporation. This is confirmed by the modern definition offered in the UNIFORM PARTNERSHIP ACT § 6(1), accepted by all common law states, which defines partnership as "[a]n association of two or more persons to carry on, as co-owners, a business

147

for profit." *See also* BLACK'S LAW DICTIONARY 1120 (6th ed. 1990).

In this light, the March 29, 2000, agreement between Poasa and Moru Mane, also signed by Sallie Mane, can be viewed as a dissolution agreement formed by the mutual agreement of all partners to CSS. Such a construction is confirmed by the words of the agreement. The title line states: "This agreement is made between Moru Mane of [CSS] and Sila Poasa, both of [CSS] and Tony's Construction." Thus, in the title line, Moru Mane is recognized as a representative of CSS, and Poasa as of both CSS and Tony's Construction. However, the title paragraph goes on to reference the departure of Poasa from CSS, and the body of the agreement refers to Poasa as of Tony's Construction only. Specifically, the headings for the columns listing the division of plant and equipment refer to "CSS (Moru)" and "Tony's Construction (Sila)." Furthermore, the signature lines show that where Moru Mane signed after the designation "For CSS", Poasa signed after "For Tony's Construction." Poasa's mention in the title paragraph of the agreement as "both of [CSS] and Tony's Construction" is thus adjectival of his status *before* signing the agreement, and his signature as "For Tony's Construction" indicates the legal effect of dissolving Poasa's relationship with CSS. We thus find, based on the explicit words of the agreement, that the intended effect of the contract was to dissolve the partnership-like business venture of CSS.

(b) CONSIDERATION

 CSS, or rather the Manes, claim that Poasa did not provide consideration for the agreement. However, where partners mutually agree to dissolve their partnership and to transfer their interests to one or both of them in return for assumption of certain partnership liabilities, the mutual promises of the partners are the consideration for the agreement. *Pejsa v. Bridges*, 213 P.2d 473, 475 (Ariz. 1950); *see also* JOHN D. CALAMARI AND JOSEPH M. PERILLO, THE LAW OF CONTRACTS § 4.1 (4th ed. 1998); RESTATEMENT (SECOND) OF CONTRACTS § 4.1 (1981). In *Pejsa*, partners entered into a dissolution agreement whereby one partner paid three other partners between $1 and $3,000 to assume all right, title, interest, claims and demands of the partnership. 213 P.2d at 474. As in this case, the partner assuming the business from the others sued to dissolve the agreement for lack of consideration. *Id.* The court ruled there to be no failure of consideration where there was an absence of allegations of fraud, deceit or coercion in procuring the agreement of dissolution, where the agreement was the product of a "free and voluntary action on the part of all the partners after a meeting of the minds the effect of which was to dissolve the partnership in the manner agreed upon" and where the agreement had the effect of settling accounts as between the partners themselves. *Id.* at 475-76. The March 29, 2000

agreement between the Manes for CSS and Poasa for Tony's Construction involves a much more balanced set of promises for promises than *Pejsa*. It divides the equipment, assets, claims, and obligations of the company between the Manes and Poasa, and designates how the office is to be divided. The agreement occurred after twenty days of discussion and at least four hours of direct negotiation and consideration of the terms of the agreement. The agreement contains, therefore, mutual promises which we are bound to give credence to in this litigation.

(c) COERCION

None of the legal documents submitted claim any fraud, deceit, or coercion. However, during testimony, the Manes implied that they were unduly coerced into signing the agreement—Sallie Mane due to Poasa's tears, and Moru Mane due to his wife's exhortations. The Manes may have been moved by grief, guilt, sadness or despair, but nowhere does the evidence indicate that they were forced or otherwise limited in their clear and abiding capacities to reason and choose in entering into the agreement. The Court adjudicates intent, not emotional motivation. Furthermore, the Court perceives through the testimonies, that rational deliberation was indeed invested in the terms of dissolution.

*2. Adequate Legal Remedy*

Having consideration, the agreement is valid and enforceable. As such, CSS's claim for its assets and equipment, based on the invalidity of the agreement, does not succeed on the merits. Furthermore, none of the equipment supplied, liabilities, buildings or projects claimed by CSS are non-compensable. Indeed, at trial, CSS presented evidence as to the value of most of the materials claimed. Since the request for injunctive relief against Poasa for use and return of these assets and equipment does not succeed on the merits, and is fully compensable in pecuniary terms, injunctive relief is therefore not available. A.S.C.A. § 43.1302.

As to CSS's request for injunctive relief against Poasa for continuing to act on behalf of CSS, and for interfering with its activities, we find that this claim for relief succeeds on its merits. A falling-out occurred between the parties, a severance agreement was reached, Poasa is no longer employed by or related to CSS, and yet he continues to represent himself as such.

Money cannot relieve CSS of any damage done to CSS through Poasa's holding himself out to third parties as an agent of CSS, where he has no actual authority to do so. We therefore grant the permanent injunction barring Poasa from holding himself out as a representative of CSS.

## B. Specific Performance

██ Poasa and Tony's Construction counterclaim for specific performance of the agreement. We have found the agreement to be supported by consideration and to be valid. Specific performance is appropriate in a case such as this, where a written agreement to end a business relationship and divide a company is the only evidence of parties' intents regarding allocation of the entire range of assets, liabilities, service work and resources in the company. As ruled in *Pejsa*, "[w]hen partners dissolve the partnership relation, whatever its character, and put their agreement in writing, that writing measures the rights and obligations of the parties." *Pejsa*, 213 P.2d at 475 (citations omitted). Money damages clearly do not resolve allocation issues in the dissolution of a partnership-like business venture. Specific performance of the agreement is therefore granted.

## Order

Judgment will accordingly enter (1) permanently enjoining Poasa from holding himself out as a representative of CSS, and, (2) decreeing specific performance of the parties' agreement dated March 29, 2000.

It is so ordered.